**Annette M. LITMAN, Plaintiff,**

v.

**GEORGE MASON UNIVERSITY, et al. Defendants.**

**No. CA–97–1755–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 26, 2001.

Annette G. Litman, Reston, VA, pro se.

William E. Thro, Newport News, VA, for George Mason University.

James V. Ingold, Fairfax, VA, for Defendant Norris.

### *MEMORANDUM OPINION*

CACHERIS, District Judge.

Annette Litman brought suit against George Mason University under Title IX. Her Complaint alleges that the university should be held liable for sexual harassment and retaliation she suffered at the hands of two of her professors. The Court is presented with a novel question: whether a plaintiff alleging Title IX retaliation must show intentional discrimination and, if so, how she makes that showing. Defendants George Mason University and Gerard Mulherin have filed a Motion for Summary Judgment; Defendant Eugene Morris has file a Motion to Dismiss Count III. For the reasons stated below, the Court will grant summary judgment on Count I of the Complaint but will deny the other motions.

## I.

Plaintiff Annette M. Litman ("Litman") was a student at George Mason University ("GMU") for approximately one year, from mid–1995 until mid–1996, when the University dismissed her after a disciplinary hearing.[1] GMU is a state-created university "subject at all times to the control of the [Virginia] General Assembly." Va. Code Ann. § 23–91.24. Moreover, the parties agree that GMU is a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).[2] *See* 20 U.S.C. § 1687. Title IX carries an implied private right of action, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979),[3] and thus permits students to recover damages for discriminatory conduct engaged in by their professors. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75–76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

For purposes of considering the Motions before it, the Court takes all allegations in the Verified Amended Complaint as true. Litman alleges that in 1995, as a student in GMU's "extended studies" program, she enrolled in a computer science course with Professor Eugene Norris, for whom she also worked as a research assistant. Over the course of the fall semester, Norris became infatuated with Litman, telling her routinely that he loved her and asking questions about her marriage and sex life. Norris also stalked Litman, waiting for her after a class, on one occasion, to tell her that he "missed her" and that, despite her efforts to avoid him, he "had his ways" of locating her. After Litman terminated her research position with Norris, she received an e-mail from him stating, "Don't marry someone you can live with, Marry someone you can't live without."

In February 1996, Litman filed a sexual harassment complaint against Norris with GMU's Equity Office, requesting that Norris be reprimanded for his conduct and ordered to stay away from her. The Equity Office ordered Norris to avoid contact with Litman, but it refused to investigate the complaint further. Finding this response inadequate, Litman sought the intervention of GMU's president. She also circulated a petition urging GMU to investigate Norris's alleged wrongdoings, but GMU failed to undertake the requested investigation.

Unable to locate a professor to supervise her senior research project, Litman maintained that GMU's engineering faculty refused to interact with her once it became known that she had filed a sexual harassment complaint against one of its members. She thereafter sent suggestive and hostile e-mail messages to certain faculty members, resulting in two professors instituting sexual harassment charges of their own against her pursuant to GMU's Student Judicial Code. Following a trial before GMU's University Judicial Board in May 1996, the Board found Litman guilty of these charges, imposed academic sanctions against her, and dismissed her from GMU. Litman's complaint against Norris was tried in October 1996 and resulted in a finding that Norris had not violated GMU's sexual harassment policy but had failed to live up to the professional stan-

---

1. The discussion of the facts is taken largely from the opinion of the Fourth Circuit in *Litman v. George Mason Univ.*, 186 F.3d 544 (4th Cir.1999).

2. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

3. Defendant GMU states that this proposition is under attack. The Supreme Court heard oral argument on January 16, 2001, in *Alexander v. Sandoval*, No. 99–1908. Broadly speaking, the State of Alabama argues in *Alexander* that there is no private right of action to enforce Spending Clause legislation against the States, absent a clear statement in the legislation imposing such a condition. Title IX does not contain such an explicit statement.

dards expected of GMU professors. No sanctions were imposed on Norris.

The Amended Complaint before the Court contains three Counts: Gender Discrimination in Violation of Title IX (Against GMU) (Count I); Retaliation in Violation of Title IX (Against GMU); and Intentional Infliction of Emotional Distress (Against Norris) (Count III). GMU has moved for summary judgment on Counts I and II, while Norris has filed a Motion to Dismiss Count III, should the Court grant summary judgment on Counts I and II.

## II.

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), cert. denied, 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir.1991).

The party seeking summary judgment has the initial burden to show the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the mere existence of a scintilla of evidence in support of a non-moving party's position is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Rather, the court must "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Brock*, 933 F.2d at 1259.

## III.

GMU argues that it is entitled to summary judgment on both Counts I (sexual harassment) and Count II (retaliation). Each will be discussed in turn.

### A.

GMU contends that Plaintiff has failed to demonstrate GMU's actual knowledge of Norris's sexual harassment of her and GMU's deliberate indifference upon learning of the harassment. GMU argues, first, that prior to February 15, 1996, Litman failed to tell an "appropriate person under 20 U.S.C. § 1682" of the harassment, and that even if she informed an "appropriate person" of the harassment, she did not sufficiently identify the harasser to give the university actual notice; and second, that GMU was not deliberately indifferent, because once it had actual knowledge, it took prompt, effective steps to stop the harassment.

### 1.

■ GMU contends that it did not have actual knowledge of the harassment until February 15, 1996. Central to its defense is an argument that "only the University Equity Officer and his staff are considered 'appropriate persons under 20 U.S.C. § 1682.'" (Mem. Supp. Summ. Judg. at 18.) Thus, GMU argues, when Litman informed one of her professors that another professor was sexually harassing her, she did not inform an "appropriate person" and therefore did not give GMU actual knowledge of the harassment.

For purposes of § 1682, an "appropriate person" is one who has "authority to address the alleged discrimination and to institute corrective measures" on behalf of the university. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). *Gebser* did not discuss who might be an official with such authority. *See Floyd v. Waiters*, 171 F.3d 1264 (11th Cir.1999). Nor has the Fourth Circuit defined the concept. However, the *Gebser* Court's holding, that tra-

ditional constructive notice and respondeat superior principles do not support liability under Title IX, sheds light on that issue. Unlike the provisions of Title VII, which consist of direct prohibitions on employers, Title IX conditions "an offer of federal funding on a promise by the recipient not to discriminate, in what amounts to a contract between the Government and the recipient of funds." *Id.* at 286, 118 S.Ct. 1989.[4] The Supreme Court reasoned that, given the contractual nature of Title IX benefits and their origin in Congress's spending power, it would be illogical to jeopardize federal funding for an entire school district where the district was not aware of, and therefore could not cure, the discrimination. *Id.* at 287–88, 118 S.Ct. 1989; *cf. Guardians Assn. v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 598–99, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (opinion of White, J.) (Title VI). Thus, the *Gebser* Court concluded that "Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice." *Id.* at 288, 118 S.Ct. 1989.

Clearly, the contract theory underlying Title IX case law severely limits who can be considered an "appropriate person" under § 1682. This District recently considered the parameters of "appropriate person." In *Baynard v. Lawson,* 112 F.Supp.2d 524 (E.D.Va.2000), Judge Brinkema held that the reasoning of a pre-*Gebser* case, *Rosa H. v. San Elizario Ind. Sch. Dist.,* 106 F.3d 648 (5th Cir.1997), remained sound in light of *Gebser.* In *Rosa H.,* the Fifth Circuit emphasized that a school district has actual knowledge only when an official with the power to address the misconduct has such knowledge. This test will tend to exclude "the bulk of employees." *Rosa H.,* 106 F.3d at 660. Similarly, in a case decided after *Gebser,* the Eleventh Circuit decided that a plaintiff must establish two things before Title IX liability will attach: first, "some supervisor

with authority to take corrective action was placed on notice of the bad conduct," and second, "the supervisor possessing this authority was a school official high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." *Floyd,* 171 F.3d at 1264. *See also Floyd v. Waiters,* 133 F.3d 786 (11th Cir. 1998).

In effect, Litman argues that once she reported the harassment to a professor, Dr. Orsak, who as a member of the university staff was obligated to report incidents of sexual harassment to the Equity Office, GMU had notice of the harassment. However, Litman has not produced evidence showing that the professor to whom Litman disclosed the harassment late in 1995 was an official with sufficient authority to cure the harassment. For example, she has not shown that Dr. Orsak had supervisory authority over the harasser, such that he could have directly taken corrective action to cure the problem.

In addition, Litman did not identify the harassing professor by name when she initially disclosed the harassment to Dr. Orsak. At oral argument, Litman contended that Dr. Orsak was fully aware that it was Dr. Norris who was harassing her. She stated that "Dr. Orsak asked a number of questions . . . until he was satisfied as to the identity of the person [harassing her.] . . . He was not confused, and he was not uncertain. And in subsequent discussions with Dr. Orsak, we did expressly use Dr. Norris's name." Tr. 41–42. Plaintiff stated that "at least by the end of the fall semester, Dr. Orsak was very well advised that the sexual harasser was Dr. Norris ." Tr. 44.

Evidence in the record suggests that in a January 1996 meeting with Equity Office personnel, Dr. Orsak did not disclose the harasser's identity, even though Litman contends he knew the harasser's identity by that time. (Aff. of Ronald Sinacore,

4. *See also Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 654 (5th Cir.1997); *Peder-* *son v. Louisiana State Univ.,* 213 F.3d 858, 876 (5th Cir.2000).

Deft's Ex. D at 1 ¶¶ 3–6) Again, though, even assuming university policy imposed on Dr. Orsak an obligation to report the harassment, as Litman contends, Litman had not informed an "appropriate person" under 20 U.S.C. § 1682. Thus, despite any failure by Dr. Orsak to comply with the university's sexual harassment policy, his knowledge cannot be imputed to the university, because case law is clear that constructive notice is not sufficient to impose institutional liability under Title IX. *See Gebser,* 524 U.S. at 289, 118 S.Ct. 1989.

In sum, the Court finds that GMU cannot be said to have had "actual knowledge" of Norris's harassment until February 15, 1996, when Litman filed a formal complaint with the Equity Office. On that date, she both notified the proper office *and* informed the Equity Office that Norris was the harasser, giving GMU actual knowledge of the harassment.

### 2.

■ Once a plaintiff shows that an institution receiving federal funds had actual knowledge of Title IX discrimination, she must prove that the institution responded to the violation of her rights with deliberate indifference. The institution's deliberate indifference then can be said effectively to "cause" the violation. *See Gebser,* 524 U.S. at 291, 118 S.Ct. 1989; *Davis v. Monroe County Bd. Of Educ.,* 526 U.S. 629, 642–43, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Liability arises from "an official decision by the [university] not to remedy the violation," *Gebser,* 524 U.S. at 290, 118 S.Ct. 1989, because "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis,* 526 U.S. at 640, 119 S.Ct. 1661.

Turning then to the deliberate indifference prong of the liability test, the Court finds that GMU did not act with deliberate indifference to the harassment upon obtaining actual knowledge of it such that GMU could be said to have "caused" the harassment. *See Gebser,* 524 U.S. at 291, 118 S.Ct. 1989; *Davis,* 526 U.S. at 643, 119 S.Ct. 1661. At Litman's request, in February 1996, the Equity Office asked Norris to discontinue contact with Litman. Norris agreed to do so. The Verified Amended Complaint does not contain any allegation that the harassment by Norris continued thereafter. In short, GMU promptly took effective action to cure the situation and did indeed cure the situation.

Because GMU did not act with deliberate indifference to the discrimination effected by its employee, the Court will not impute Title IX liability to it. The Motion for Summary Judgment on Count I is GRANTED.

### B.

GMU further argues that it is entitled to summary judgment on the retaliation claim, Count II. First, GMU contends Litman has not shown GMU engaged in intentional discrimination such that she is entitled to compensatory damages, because she has not shown that an appropriate person had actual knowledge of retaliation and that GMU responded with deliberate indifference. For purposes of its summary judgment motion, GMU concedes that it had actual knowledge of two incidents of retaliation: the closing of a computer lab and the decision to initiate student disciplinary hearings against Plaintiff.[5] GMU acknowledges its obligation to investigate instances of retaliation. Although it did not investigate Plaintiff's allegations, GMU argues that it would have done so if Plaintiff had followed the proper procedures in reporting the alleged retaliation. GMU points out that it repeatedly encouraged Plaintiff to submit her complaint properly. Thus,

---

**5.** GMU contends that these two incidents were the only acts of retaliation which Litman communicated to the appropriate officials. Therefore, these are the only retaliatory actions of which GMU can be said to have had actual notice. For purposes of considering the Motion for Summary Judgment on Count II, the Court assumes without deciding that GMU is correct.

GMU contends, it was not deliberately indifferent to her complaints of retaliation.

There has been very little case law development of the proper standard to apply in a Title IX retaliation claim. GMU contends, first, that to recover compensatory damages, Litman must prove GMU's discrimination was intentional. Further, GMU argues that in assessing whether the alleged retaliation was intentional discrimination, the Court should apply the same two-prong analysis used in the harassment context, *i.e.*, actual knowledge on the part of the institution, followed by deliberate indifference to the retaliation. GMU argues that application of this framework demonstrates that GMU did not act with deliberate indifference to Litman's claim of retaliation.

1.

█ The Fourth Circuit has not decided whether a plaintiff seeking compensatory damages for retaliation under Title IX must prove that the recipient of federal funds acted intentionally. At least one Circuit, the Sixth, has addressed the issue, however, and concluded that a plaintiff must prove intent before she can obtain *any* compensatory relief under Title IX. *Horner v. Kentucky High Sch. Athletic Assn.*, 206 F.3d 685 (6th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 69, 148 L.Ed.2d 34 (2000).[6] In *Horner*, which did not involve harassment or retaliation like that at issue here, the Sixth Circuit observed that "proof of intent, however defined, is the *sine qua non* to compensatory relief for *any* type of Title IX violation." *Id.* at 689 (emphasis added). This conclusion arises from the consensual, contractual nature of Title IX; because the receipt of federal funding is conditioned upon the recipient's promise not to discriminate, a "recipient should therefore not be subject to money damages unless it has notice that

it will be liable for the conduct at issue." *Id.*

The Supreme Court's treatment of other legislation enacted under Congress's spending power supports the conclusion that a plaintiff seeking damages must prove intent to discriminate. In the Title VI context, for example, "Justice White's opinion announcing the Court's judgment in *Guardians Assn. v Civil Serv. Comm'n of New York City* ... concluded that the relief in an action under Title VI alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, 'it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition].' " *Gebser*, 524 U.S. at 287, 118 S.Ct. 1989 (*quoting Guardians Assn.*, 463 U.S. 582, 598, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). As the Court remarked in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." *Franklin*, 503 U.S. at 74, 112 S.Ct. 1028.

The Court holds that a plaintiff seeking damages for retaliation under Title IX must prove that the institution intentionally discriminated against her. This holding is compelled by the consensual nature of Title IX and the importance of ensuring that the recipient of federal funding not be held to have violated the Title IX "contract" without notice of its violation.

2.

█ GMU argues that in assessing whether retaliation is intentional discrimination, the Court should look for the two elements applied in the harassment context, *i.e.*, actual knowledge on the part of the institution, followed by deliberate indifference to the retaliation. For the pur-

---

**6.** The Fifth Circuit was presented with the question whether intentional discrimination must be shown for Title IX damages, but decided the case before it on other grounds.

*Pederson v. Louisiana State Univ.*, 213 F.3d 858, 876 (5th Cir.2000). Thus, the Sixth Circuit appears to be the only Circuit that has considered and ruled on the issue.

pose of this motion, GMU concedes that it had actual knowledge of the two incidents of retaliation which Litman reported to the Equity Office. Thus, if the Court adopts the suggested framework, the question before it is whether GMU acted with deliberate indifference in not investigating those incidents of retaliation, merely because Litman failed to comply with the university's policy that discrimination complaints be in writing.

No court has yet addressed the issue before the Court today: how a plaintiff proves intentional discrimination in the context of a Title IX retaliation claim. Intentional discrimination is proven differently in different Title IX contexts. Thus, where an institution has an official policy of discriminating on the basis of gender, two Circuits have suggested that the proper standard is discriminatory animus. *See Horner v. Kentucky High Sch. Athletic Assn.*, 206 F.3d 685, 693 & n. 4 (6th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 69, 148 L.Ed.2d 34 (2000); *Pederson v. Louisiana State Univ.*, 201 F.3d 388, 412–13 (5th Cir.), *vacated and superseded on other grounds,* 213 F.3d 858 (5th Cir.2000). Where discrimination is not an institution's official policy, however, as in the sexual harassment context, courts have applied the actual knowledge plus deliberate indifference framework. *See Gebser,* 524 U.S. at 290, 118 S.Ct. 1989; *Horner,* 206 F.3d at 693.

Retaliation that is not an institution's official policy is akin to harassment that is likewise not the institution's official policy. The Court therefore finds that where retaliation is not the official policy of an institution, to prove intentional discrimina-

tion the plaintiff must prove that the institution knew of a violation but acted with deliberate indifference to it. Plaintiff has not alleged that GMU's official policy was to retaliate against those who complained of discrimination. Therefore, the Court will apply the same actual knowledge plus deliberate indifference framework employed in its discussion of Count I.

### 3.

GMU argues that once it had actual knowledge of the two incidents of retaliation, the closing of the computer lab and the institution of disciplinary proceedings that led to Litman's dismissal from the university, it did not react with deliberate indifference and would have investigated Litman's allegations, but for her own failure properly to report the violations. GMU states that its official policy required complaints of discrimination, including retaliation, to be filed in writing before an investigation could proceed. Litman contends to the contrary that her complaint did not in fact have to be in writing. However, the Court has examined GMU's standard sexual harassment brochure, included in Plaintiff's exhibits. Since Litman wanted more than mediation or discussion of the problem with the harassing professor, she could not follow "informal" procedures, which allow a student to report harassment verbally to a professor, advisor, or the Equity Office, among others. Instead, she had to follow "formal" procedures, which include filing a written complaint.[7] *See* Pltf's Ex. K, at 8. At the same time, Litman contends that GMU had an obligation to assist her in preparing her retaliation complaint.[8]

---

7. The Court notes that it would reach the same conclusion on the retaliation claim whether the applicable policy required the complaint to be in writing or allowed it to be made orally.

8. Pltf's Aff. at 63 ¶ ccxi. The scope of that allegedly required assistance is not defined in the university's sexual harassment brochure submitted with Plaintiff's Opposition. *See* Pltf's Ex. K. Under Rule 56(c), "[s]worn or

certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Fed.R.Civ.P. 56(c). Plaintiff did not supply the Court with a copy of the referenced "GMU Sexual Harassment Policy & Grievance Procedures." The Court therefore cannot assess whether GMU failed duly to provide her with assistance in filing her retaliation complaint but focuses its discussion on whether circumstances required a waiver of the policy.

Litman's Verified Amended Complaint states that "[f]rom April 29 to September 4[, 1996,] Litman attempted repeatedly to file a complaint with the GMU Equity Office alleging retaliation ... [A GMU official] informed Litman that the Equity Office would not process more than one complaint at a time from her and that the current sexual harassment process had to run its course before GMU would proceed with her retaliation complaint." (Verified Am. Comp. ¶ 290.) During this time frame, she was admitted to the emergency room suffering anxiety attacks (¶ 238); she was self-medicating with prescription tranquilizers and sedatives (¶ 251); she was receiving psychological counseling (¶ 260); and, after suffering a second nervous breakdown, she spent ten days as an inpatient at Dominion Psychiatric Hospital (¶ 282). The Court takes those allegations as true.

GMU has submitted the affidavit of Ronald Sinacore, GMU's Affirmative Action Planning and Compliance Coordinator. Deft's Ex. D. In the affidavit, Sinacore states that he first became aware of Litman's retaliation claims on April 29, 1996. (Sinacore Aff. ¶ 51 .) He states that he told her that unless she produced evidence that the closure of the computer lab was retaliation *against her;* the Equity Office would not intervene. (*Id.* ¶¶ 53–54.) The affidavit does not include an indication that Litman was informed at that time of GMU's policy that all complaints had to be in writing. Sinacore further states that Litman returned to the Equity Office in mid-July 1996 to file a retaliation complaint as a result of her expulsion, at which time she was advised of the policy of written complaints. (*Id.* ¶¶ 55–59.) Sinacore states that Litman informed him that her disability and medication prevented her from complying with the policy and requested that the Equity Office draft the complaint on her behalf, which request Sinacore refused. (*Id.* ¶¶ 61–63.) Sinacore states that he did agree to provide a "template" for her to follow and followed up their meeting with a letter and standard form

for reporting discrimination. (*Id.* ¶¶ 65–66; Deft's Ex. H.) He then questioned her about the retaliation and attempted to convince her that there was no "conspiracy" at work against her. (Sinacore Aff. ¶¶ 67–73.) When Litman retained counsel in September 1996, Sinacore sent him a letter noting that with his participation in the matter, Litman's "request to modify our complaint intake procedure based on an alleged disability ... should no longer be salient." Deft's Ex. J.

Mr. Sinacore's affidavit lends support to Plaintiff's claim that she initially believed a verbal report would suffice, at least insofar as the lab closure in April was concerned, because Sinacore does not state that he told her of the writing requirement for retaliation complaints until her visit to the Equity Office in mid-July, some three months later. Given Litman's description of her dire psychological condition at the time of her verbal complaints to the Equity Office in April and July, Litman argues that she was literally unable to comply with the writing requirement during that period. GMU was aware of her inability to comply, in light of her repeated attempts to obtain a waiver of the policy.

The Court is troubled by GMU's apparent position that Litman's mere failure to follow the university's own policy that complaints be in writing—which is *not* a Title IX requirement—essentially relieved it of its obligation to conduct a full investigation into her allegations. In effect, GMU appears to be arguing that the policy that complaints be in writing means the Equity Office lacked the "authority to take remedial action" as long as Litman failed to file a written complaint. *See Davis* at 644, 119 S.Ct. 1661. At oral argument on the motion, counsel for GMU was unable to verify whether the university ever waived the policy that complaints must be in writing. After acknowledging that a policy requiring that complaints be made by certified mail, return receipt requested "would be probably unreasonable," Tr. at 6, counsel

conceded that he thought "oral [notification] would be sufficient if the oral was specific enough." *Id.*

Plaintiff has presented evidence that during a meeting on May 23, 1996, she provided several specific examples of alleged retaliation against her, including Dr. Orsak's refusal to supervise Plaintiff's senior project and his attempts to remove her from his class and to delete her information from the university's e-mail system. The Court cannot say as a matter of law that those details were not specific enough to shift the burden to GMU to investigate Litman's complaint.

Moreover, in this factual setting, the Court finds that there is a colorable argument that GMU's refusal to accommodate her disability by waiving the writing requirement may constitute deliberate indifference to her claims of retaliation, at least until she secured legal representation. This is a matter not properly decided on a Motion for Summary Judgment. Accordingly, the Motion for Summary Judgment on Count II is DENIED.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

1) Defendant George Mason University's Motion for Summary Judgment is **GRANTED** as to Count I and **DENIED** as to Count II of the Complaint;

2) Defendant Eugene Norris's Motion to Dismiss Count III of the Complaint is **DENIED**;

3) Plaintiff's request for sanctions against Defendant George Mason University is **DENIED**; and

4) The Clerk of the Court shall forward copies of this Order and the accompanying Memorandum Opinion to all counsel of record.