Snelling v. Fall Mtn. School          CV-99-448-JD  03/21/01

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Joel Snelling
and Derek Snelling

        v.                                Civil No. 99-448-JD
                                          Opinion No. 2001 DNH 057
Fall Mountain Regional
School District, et al.


O R D E R


The plaintiffs, Joel and Derek Snelling, brought suit against the Fall Mountain Regional School District and school officials and personnel alleging claims under 20 U.S.C.A. § 1681 ("Title IX"), 42 U.S.C.A. § 1983, and state law. The plaintiffs' claims arise from harassment they endured while they were students at Fall Mountain Regional High School. The defendants move for summary judgment, and the plaintiffs object.


Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The record evidence is taken in the light most favorable to the nonmoving party. See Zambrana-Marrero v. Suarez-Cruz, 172

F.3d 122, 125 (1st Cir. 1999).  "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party and a 'material' fact is one that might affect the outcome of the suit under governing law."  Fajardo Shopping Ctr. v. Sun Alliance Ins. Co., 167 F.3d 1, 7 (1st Cir. 1999).  Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## Background[1]

Derek Snelling entered Fall Mountain Regional High School as a freshman in September of 1994.  He was small for his age, but played basketball and loved the game.  The high school basketball program had three levels, freshman, junior varsity, and varsity, that were coached by the same coaches, Athletic Director and Coach, Brian Pickering, Coach Kevin Hicks, Coach James Brunelle, and Coach Robert Weltz.  The principal of the high school was Alan Chmiel, and Leo Corriveau was the superintendent of schools.

Derek Snelling had heard before attending the high school that the basketball coaches were from Walpole and preferred

_____

[1]For purposes of summary judgment, the defendants accept the plaintiffs' allegations as true.  See LR 7.2(b)(1).

2

players from Walpole over those from Charlestown, where Derek lived. Once he was on the team, he found that the Walpole players were a clique and that for reasons he did not understand, they did not like him. Although he had never been harassed before coming to the high school, Derek recounts that harassment began after an incident in November of 1994.

After practice on November 16, 1994, Derek was the only person who took a shower. The next day at school, a basketball team member, one of the Walpole players, walked up to Derek and said, "How are you, Stiffy? I saw you in the showers last night with another guy and you had a 'stiffy.'" From then on, Derek says, he was called "Stiffy" by the other team members. The name-calling also included "fag," "jew boy," and "homo," all of which were said harshly and with hatred.

In addition to the name-calling, the same group of basketball players confronted Derek asking him why he was dating a girl and said he was just trying to cover up his sexual preference. Once, when he left a practice to use the bathroom, the same group of players followed him into the locker room and confronted him saying, "Smells like a homo in here. Is that you Stiffy? I thought I could smell Vaseline." The name-calling, taunting, and abusive behavior occurred in the presence of the coaches who did nothing.

3

Derek felt that the coaches did not treat him fairly.  At an away game, as he came off the court and passed Coach Brunelle, Brunelle grabbed him by the shirt, swung him around, and shouted at him never to run by again.  When he was treated unnecessarily roughly by a fellow teammate, who also swore at the coach about the incident, the player was not even reprimanded.  Derek felt that he was not given a fair amount of playing time or encouragement.

Joel Snelling entered the high school in the fall of 1995.  Verbal abuse of Derek had spread to the other students from the basketball players.  The coaches continued to ignore the abuse and intentional physical abuse of Derek by other players.  Joel also played basketball.  Joel reports that he did not experience much harassment until his sophomore year when students began calling him "Little Stiffy."  The verbal abuse increased in his junior year, and he was also called "fag boy."  In one incident, Joel criticized the effort of a player who was the son of one of the coaches.  The player swore at Joel and Joel's father.  The player was not disciplined, and instead Joel was told he would have to apologize or be suspended from the team.

Derek complained to the principal, Alan Chmiel, about the abuse.  In response to Derek's concerns about name-calling, Chmiel explained to Derek that peers can be mean in high school,

4

which is a part of growing up. Chmiel said that "Stiffy" was just his nickname, which he should accept and move on.

Derek and Joel bought weight vests to wear during practice to enhance their jumping ability in games. At practice, Coach Weltz referred to the vests as "bras" and would tell them to take their "bras" off. Weltz said that Derek could take his "bra" off faster than Joel could. The coaches continued to ignore the verbal and physical harassment of Derek and Joel by the other players.

In December of 1996, Derek aired his concerns about his treatment to Assistant Principal Dimick who told him to fill out a sexual harassment complaint. When Derek said that he was afraid that would only make things worse, they decided to talk with Chmiel. Chmiel encouraged Derek to file a complaint against Weltz based on the "bra" incidents, which was investigated by Dimick. Weltz denied making the "bra" remarks. Three team members who were part of the abusive group backed him up, and Dimick did not ask any other players about the remarks or investigate further. Derek was told that because the incident could not be proven, nothing would be done.

The physical abuse of Derek escalated after he complained about Weltz. At one game, Derek's teammates loudly taunted him with names while he warmed up, while Coach Hicks sat near them

and did nothing.  In February during practice, a teammate repeatedly hit Derek in the head with the basketball asking Derek, "Are you sorry now?" while Athletic Director Pickering and Coach Hicks sat less than twenty feet away.  Derek was treated at the hospital after the attack due to dizziness, blurred vision, and headache.

Mr. and Mrs. Snelling met with the superintendent of the school district, Leo Corriveau, in March of 1997.  After the meeting, the lawyer for the school district sent the Snellings a letter in which he set out the action that would be taken.  He said that the basketball coaches would not be back next year and promised that the superintendent would meet with the principal and assistant principal about the problem and would ensure that the coaches and athletic director were informed of the district's sexual harassment policy and that they were responsible for the safety and proper treatment of the children.  Corriveau issued a memo to the principal, assistant principal, and athletic director about the complaint and directed them to take necessary steps to protect the Snelling children.  The memo told the recipients to notify Corriveau in writing when they had completed their assignments.  No such notifications are included in the record.

The verbal and physical abuse continued for the remainder of the boys' high school experiences.  The Snellings asked the boys

to attend each others' practices in order to watch what was happening. When Joel, who was on the junior varsity team, tried to watch the varsity practice, the coaches told him the practice was "closed" and refused to let him stay. Physical abuse was seen by the coaches and reported to them, but was not remedied.

In January of 1998, the captain of the basketball team assaulted another team member. A third team member threatened to kill Derek if he told the administration what he had seen of the incident. Although Derek answered truthfully to the administration about the incident and reported the threat to kill him, the player that threatened him was not disciplined.

At basketball games, when either Derek or Joel stepped onto the court, the players on the bench and many spectators would scream "Stiffy." Team members and the spectators also called Derek and Joel, who were small for their ages, "Smurf" and called their father "Papa Smurf." When Derek graduated, the audience yelled "Stiffy" when he received his diploma. The record includes affidavits from two of the boys' friends and a parent of one friend that confirm the boys' reports of abuse. The boys contend that their grades suffered as a result of the abuse and that they have experienced a variety of emotional and physical distresses as well as the injuries of physical abuse.

## Discussion

In their complaint, the plaintiffs allege claims arising from harassment by fellow students and coaches based on Title IX, § 1983, and state law claims of negligence, assault, and negligent and intentional infliction of emotional distress. The plaintiffs bring their claims against the Fall Mountain Regional School District; Fall Mountain School Board; Leo Corriveau, superintendent; Alan Chmiel, principal of Fall Mountain High School; Brian Pickering, athletic director and coach; James Brunelle, basketball coach; Kevin T. Hicks, basketball coach; and Robert Weltz, basketball coach. The defendants move for summary judgment with respect to the plaintiffs' federal claims, seek qualified immunity, and ask the court to decline supplemental jurisdiction as to the state law claims.

### A. Title IX Claims

Title IX provides that "'[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 638 (1999) (quoting 20 U.S.C.A. § 1681(a)). Student harassment of another student may constitute discrimination under Title IX

8

when the funding recipient engages in harassment directly or when the funding recipient's deliberate indifference subjects its students to harassment.  See id. at 644-45.  A cause of action under Title IX may only be brought against the recipients of federal educational funding, not against individuals.  See Lipsett v. Univ. of P.R., 864 F.2d 881, 901 (1st Cir. 1988); Doe v. Sch. Admin. Unit No. 19, 66 F. Supp. 2d 57, 62 (D. Me. 1999).

### 1. Claims against individual defendants.

The individual defendants seek summary judgment with respect to the Title IX claims on the ground that such claims may be brought only against funding recipients.  The plaintiffs argue that their Title IX claim against the individuals should be construed as part of their § 1983 claim.  Since it is clearly established that Title IX claims are not cognizable against individual defendants, the individual defendants in this case are entitled to summary judgment with respect to the Title IX claims against them.[2]

---

[2]The plaintiffs did not plead Title IX as a basis for § 1983 liability.

9

2.  Type of discrimination claimed.

The school district and school board contend that they are entitled to summary judgment as to the Title IX claim because the "teasing" the plaintiffs endured did not constitute harassment that is actionable under Title IX and because their response was reasonable.  The defendants argue that harassment based on the victim's sexual orientation is not actionable.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999).[3]  The plaintiffs respond that the harassment they experienced arose from the perpetrators' sex-based stereotypes of masculinity, which is actionable under Title IX.  See id. at 261 n.4 ("a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity"); see also Rosa v. Park West Bank & Trust Co., 214 F.3d 213, 215-16 (1st Cir. 2000).  Since the plaintiffs articulate an actionable basis for their Title IX claim, which may be inferred from their allegations and which the defendants have not addressed, the defendants are not entitled to summary judgment on the asserted ground that Title IX does not provide a cause of action for discrimination based on sexual orientation.

---

[3]Cases pertaining to Title VII may be used by analogy in the context of Title IX claims.  See Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir. 1995).

### 3. Nature of the conduct.

The defendants argue that the harassment that Derek and Joel endured was not severe enough to be actionable under Title IX.[4] Instead, the defendants characterize the harassment as "'simple acts of teasing and name-calling among school children.'" Defs. Mem. at 9 (quoting Davis, 526 U.S. at 651). To be actionable, "a plaintiff must establish sexual harassment of students that is so severe, pervasive and objectively offensive and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." Davis, 526 U.S. at 651. "Whether gender-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships,' Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998), including but not limited to the ages of the harasser and

---

[4]The defendants also challenge the plaintiffs' evidence of the harassment they endured. Since the defendants accepted the plaintiffs' factual allegations from their complaint for purposes of summary judgment, without providing a properly supported factual statement of their own, their challenge is unfounded. The plaintiffs' chart of abuse, which the defendants criticize as "self serving," was submitted to the defendants as part of the plaintiffs' sworn answers to interrogatories, which are competent evidence in the context of summary judgment. See Fed. R. Civ. P. 56(c) and 56(e). Further, the plaintiffs submitted their own affidavits and the affidavits of two friends and the mother of a friend in support of their allegations of abuse.

11

the victim and number of individuals involved, see OCR Title IX Guidelines 12041-12042." Id. at 651.

The Office of Civil Rights ("OCR") Title IX Guidelines cited by the Supreme Court identify the following factors to consider in assessing the severity of student harassment: the degree of the effect on the victim's educational experience; the type, frequency, and duration of the conduct; the identity and relationship between the harasser and the victim; the number of individuals involved (a group is worse than an individual harasser); the ages and sexes of the harassers and victims (harassment of younger students by older ones more intimidating); the size of the school, location of the incidents, and context in which they occurred; other incidents at the same school; and incidents of gender-based, but non-sexual harassment. See 62 Fed. Reg. 12,034, 12,041-42 (Mar. 13, 1997). Although peer harassment is less likely than teacher-student harassment to be actionable, "Title IX liability may arise when a funding recipient remains indifferent to severe, gender-based mistreatment played out on a 'wide-spread level' among students." Davis, 526 U.S. at 653.

The undisputed record submitted for summary judgment describes both wide-spread peer harassment and some harassment by coaches. Given the nature of the harassment endured by Derek and

12

Joel, a jury could reasonably conclude that the harassment went far beyond mere teasing. Therefore, a trialworthy issue remains as to whether the harassment was sufficiently severe, pervasive, and objectively offensive to be actionable under Title IX.

### 4. Deliberate indifference.

The plaintiffs must also show that the defendants actually knew of the harassment and remained deliberately indifferent to it in circumstances where they could exercise "substantial control over both the harasser and the context in which the known harassment occurs." Davis, 526 U.S. at 646. Further, the defendants' deliberate indifference must be "clearly unreasonable in light of the known circumstances." Id. at 648. School administrators are not expected to provide a remedy in all circumstances, but instead their response must not be clearly unreasonable. See id. at 649. "If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment. Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability." Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999) (citation omitted).

The defendant school board argues that there is no evidence that it had actual knowledge of any harassment. Although the

13

school board does not address the issue, notice to a school official who has authority to take corrective action on behalf of the funding recipient is notice to the funding recipient. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 277 (1998). The Supreme Court has not specified which school officials might receive notice on behalf of a funding recipient, but other courts have interpreted the requirement to mean that the official must have authority to take corrective action and must be sufficiently high in the school's command chain that the official's actions constitute an official action by the funding recipient. See, e.g., Davis v. DeKalb County Sch. Dist., 233 F.3d 1367, 1371 (11th Cir. 2000); Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 384 (5th Cir. 2000); Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 609-10 (3th Cir. 1999); Litman v. George Mason Univ., 2001 WL 198811, *3 (E.D. Va. Feb. 26, 2001).

The moving party bears both the initial burden of demonstrating the absence of a genuine issue of material fact and the ultimate burden of persuasion on the motion. See Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). The school board does not contend that any of the people who had notice of the harassment of Derek and Joel lacked authority to take corrective action or lacked authority in the school's chain of command to act on behalf of the school board. Therefore, the question of

14

notice remains a trialworthy issue.

The defendants also contend that their response to the reports of abuse was not clearly unreasonable. The defendants cite the Snellings' meeting with Superintendent Corriveau in March of 1997 as their first notice of the situation. The plaintiffs rely on notice of the abuse to the school principal in the spring of 1996. The notice issue is not well-developed by the parties, and since a principal may constitute a sufficiently high-ranking official for Title IX notice purposes, that inference will be made in favor of the plaintiffs in the context of the present motion.

Based on the record presented for summary judgment, Principal Chmiel responded to Derek's complaints of being called "Stiffy" along with other names and physical abuse by telling him that nicknames were a part of growing up and should be tolerated. Chmiel did nothing to investigate Derek's complaints or to provide a remedy. Chmiel's response and lack of action was clearly unreasonable and demonstrated deliberate indifference to the treatment Derek was receiving.

After the Snellings met with Superintendent Corriveau in March of 1997 to air their complaints about the treatment of Derek and Joel at school, Corriveau sent a memo dated April 1, 1997, to Principal Chmiel, Assistant Principal Dimick, and

15

Athletic Director Pickering.  The memo stated, in pertinent part:

<u>Important Action Requested</u>

After meeting with the Snellings, their attorney and ours, you are directed to take the following steps to ensure that these issues are addressed without further incident.

1.  Alan [Chmiel] is directed to take whatever steps are necessary and appropriate to assure the safety of these children.

2.  Alan and I will review with Terry [Dimick] the appropriate use of the sexual harassment policy.

3.  Brian [Pickering], as Athletic Director, must make certain that any such conduct on the part of the athletes and coaches will not be tolerated.  It is the AD's responsibility to assure that all students are treated equally regardless of the sport or the coach.

4.  The AD is also to make certain that all coaches who are hired for the 1977[sic]-98 school year are trained to deal with those situations that might arise when groups of students are put together on team sports. Coaches will understand that they are not permitted to tolerate unfair or unsafe conduct by any student particularly if that conduct places any other students at risk for their safety.

When you have completed these assignments, please notify me in writing.

Defs. Ex. C.  The summary judgment record does not include any response to Corriveau's memo from Chmiel, Dimick, or Pickering, which permits an inference in favor of the plaintiffs that they did not respond as they had been directed to do.  The verbal and physical abuse continued, including the incident at graduation

16

when the crowd yelled "Stiffy" as Derek received his diploma.

Based on the summary judgment record, a trialworthy issue remains as to whether the defendants' lack of response, after notice of the harassment in 1996, was clearly unreasonable. Corriveau's memo in April of 1997 was not a timely response to notice that was provided a year earlier. In addition, given the public nature of the continuing abuse and the memo recipients' failure to respond as they were directed to do, a reasonable inference may be drawn that the defendants knew that their response was inadequate. Therefore, a trialworthy issue remains as to whether the defendants were deliberately indifferent to the harassment of Derek and Joel.

B.   Section 1983 Claims

The plaintiffs bring civil rights claims against all of the defendants, contending that the harassment violated their Fourteenth Amendment rights to substantive due process and equal protection. The defendants argue in support of summary judgment that they had no constitutional duty to protect the plaintiffs and that the "teasing" the plaintiffs suffered did not rise to the level of a substantive due process violation.[5]  The

_____

[5]The defendants raise an issue as to whether the plaintiffs' § 1983 claims are precluded by their Title IX claims to the extent the claims are based on the same conduct.  The defendants

17

defendants argue that the plaintiffs cannot prove an equal protection claim.

### 1. Substantive due process.

The plaintiffs claim that the defendants' actions and failure to act in response to the verbal and physical harassment violated their rights to substantive due process under the Fourteenth Amendment.

> "There are two theories under which a plaintiff may bring a substantive due process claim. Under the first, a plaintiff must demonstrate a deprivation of an identified liberty or property interest protected by the Fourteenth Amendment. Under the second, a plaintiff is not required to prove the deprivation of a specific liberty or property interest, but, rather, he must prove that the state's conduct 'shocks the conscience.'"

Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000) (quoting Brown, 68 F.3d at 531). In general, substantive due process rights do not protect against the state's failure to provide protection from the actions of private parties. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189

---

raise the preemption issue perfunctorily, in a footnote and without developed argumentation, despite the fact that the issue has not been addressed by the First Circuit and district courts in the First Circuit and other circuit courts have reached varying conclusions. See, e.g., Henkle v. Gregory, 2001 WL 213005, at *66 (D. Nev. Feb. 28, 2001); Doe, 66 F. Supp. 2d at 65-66. The court will not address preemption in this context. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 62 n.15 (1st Cir. 1999).

18

(1989); accord Hasenfus v. LaJeunesse, 175 F.3d 68, 71 (1st Cir. 1999). Exceptions may arise in limited circumstances when the state creates a special relationship with the plaintiff as in the custodial setting of a prison or a mental hospital and when the state creates or markedly increases the risk of danger to the plaintiff. See id. at 71, 73; see also, e.g., Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996).

The plaintiffs contend that the defendants increased the risk of danger to them by condoning and encouraging the students' harassment and abusive conduct. To be actionable under an increased-risk-of-danger theory, the state actors must engage in affirmative conduct that creates or markedly increases the plaintiffs' risk of harm and the state actors' conduct must be conscience-shocking or outrageous.[6] See Hasenfus, 175 F.3d at

_____

[6]The cases cited by the plaintiffs are inapposite because they do not address the liability of school officials for student harassment under an endangerment theory. See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 451 (5th Cir. 1994) (denying qualified immunity to school officials under a supervisory liability theory for teacher's physical sexual abuse of student); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3d Cir. 1989) (same); see also J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 272-73 (7th Cir. 1990) (affirming dismissal of substantive due process claim for sexual molestation of student by teacher finding no special relationship between school and student); Canty v. Old Rochester Reg'l Sch. Dist., 54 F. Supp. 2d 66, 71-73 (D. Mass. 1991) (denying motion to dismiss claim of school officials' liability for requiring student to attend school under supervision of teacher who officials knew had sexually abused her and other students). In Lipsett v. Univ. of

19

73; see also Boveri v. Town of Saugus, 113 F.3d 4, 6 (1st Cir. 1997); Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir. 1996).

"[T]he measure of what is conscience shocking is no calibrated yard stick," but instead "point[s] the way" to constitutionally deficient conduct. County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (internal quotation omitted). The question of whether particular conduct shocks the conscience is "necessarily fact-specific and unique to the particular circumstances in which the conduct occurred."[7] Cruz-Erazo, 212 F.3d at 623.

The only affirmative acts by a defendant that the plaintiffs identify in their objection as violating their due process rights are Coach Weltz's "bra" remarks. Otherwise, the plaintiffs cite the defendants' failure to act, which is not actionable under a state endangerment theory. See Hasenfus, 175 F.3d at 73; see also Butera, 235 F.3d at 649 ("no constitutional liability exists

---

P.R., 864 F.2d 881, 907 (1st Cir. 1988), the university officials' failure to investigate harassment was discussed in the context of a discrimination claim, not substantive due process. Since the student harassers in this case are not state actors, the supervisory liability theory would not apply.

[7]Although other circuits follow multi-factored analyses for determining when defendants' conduct is actionable under a state endangerment theory, the First Circuit has not adopted a similar multi-factored analysis. See, e.g., Butera v. District of Columbia, 235 F.3d 637, 653-54 (D.C. Cir. 2001).

20

where the State actors had no hand in creating a danger but simply stood by and did nothing"). Taken in the broader context of the harassment the plaintiffs endured from their teammates and other students, Coach Weltz's remarks appear to be unprofessional, insensitive, and even cruel. The coach's apparent participation in the harassment may have emboldened others to continue or even increase their harassment of the plaintiffs. Weltz's conduct, however, does not sink to the level of conscience-shocking behavior.

While highly physically intrusive actions are more likely to meet the standard, the First Circuit has not ruled out verbal harassment as conscience-shocking behavior. See Cruz-Erazo, 212 F.3d at 622. Similarly, other courts have most often found conscience-shocking behavior in schools when students were subjected to physical sexual abuse or excessive punishment. See, e.g., Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1077 (11th Cir. 2000) (finding sufficient allegation of substantive due process violation where coach, as punishment, intentionally hit football player in the head with metal lock and knocked out his eye); Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1262 (10th Cir. 1998) (concluding after student's suicide that defendants' conduct increased risk and was conscience shocking if they knew in suspending and sending special education student

21

home alone that he had threatened suicide and violence and had access to firearms); Doe, 15 F.3d at 451 (finding substantive due process violation in sexual abuse of student by teacher); Hinkley v. Baker, 122 F. Supp. 2d 48, 52-53 (D. Me. 2000) (discussing shocks-the-conscience standard in teacher sexual abuse cases). In contrast, in Abeyta v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1258 (10th Cir. 1996), the court determined that a teacher who repeatedly called a female sixth grade student a prostitute for a month and a half and encouraged the other students to harass her did not violate her substantive due process rights.

Although the plaintiffs, and Derek in particular, were subjected to physical as well as verbal abuse by their teammates and fellow students, the plaintiffs have not established a strong link between Weltz's "bra" remarks and particular incidents of physical abuse or even an escalation in the verbal abuse, which occurred before the remarks. It might be inferred that Weltz's remarks, and his denial when Derek reported the remarks, led to the incident when a teammate repeatedly hit Derek in the head with a basketball. Even if it were established that Weltz's remarks and conduct caused the basketball hitting incident, which should not have occurred and should not have been tolerated, such behavior was not so egregious or outrageous as to shock the conscience.

22

## 2. Equal Protection

The plaintiffs allege their equal protection and substantive due process claims together in one count without distinguishing between them. The count contains no factual allegations that pertain to equal protection, but instead merely states: "Similarly situated students have a right under the equal protection clause to be treated similarly." Am. Compl. ¶ 60. The defendants assumed that the equal protection claim was based on the alleged disparate treatment between Charlestown and Walpole students. In their objection to summary judgment, the plaintiffs explain that their equal protection claim is that similar harassment of women or of a racial group would not have been tolerated. As such, the claim appears to fall within the disparate treatment area of discrimination.

Liability for a disparate treatment claim depends on proof that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 909 (1st Cir. 1995). The plaintiffs have not alleged any facts in support of their disparate treatment theory or any other theory. Given the lack

23

of factual allegations to support any theory of equal protection, the plaintiffs have not alleged an equal protection claim.  See, e.g., Yeo v. Town of Lexington, 131 F.3d 241, 252 (1st Cir. 1997) ("conclusory allegations, improbable inferences, and unsupported allegations" insufficient to state a claim); Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989); Krohn v. Harvard Law Sch., 552 F.2d 21, 25 (1st Cir. 1977) (dismissing discrimination claim due to lack of factual allegation).

C.   State Law Claims

Since one of the plaintiffs' federal claims remains, the defendants' request that the court decline supplemental jurisdiction with respect to the state law claims, see 28 U.S.C.A. § 1367(c)(3), is denied.  However, the plaintiffs are instructed to review their state claims and to reduce the number of those claims in order to eliminate unnecessary duplicity.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 13) is granted with respect to the plaintiffs' § 1983 claims, Count II, and is otherwise denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

March 21, 2001

cc:  Edward M. Van Dorn Jr., Esquire
     Donald E. Gardner, Esquire