**Randi (Ricklick) WATERS, Plaintiff,**

v.

**METROPOLITAN STATE UNIVERSITY, a state program; Mark Matthews, in his individual and official capacity; State University Board, a state agency; State of Minnesota, Defendants.**

No. CIV. 98–1192 (DWF/AJB).

United States District Court,
D. Minnesota.

March 21, 2000.

Steven Heikens, Heikens Law Office, Minneapolis, MN, for Plaintiff.

Mark Matthews, Metropolitan State University, Minneapolis, MN, pro se.

Nancy Joyer, Assistant Attorney General, Minnesota Attorney General, St. Paul, MN, for State Defendants.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on February 25, 2000, pursuant to the State Defendants' Motion for Summary Judgment, in which motion Defendant Mark Matthews joined. In the Complaint, Plaintiff alleges violation of Title IX (both tangible and intangible education detriment) with respect to the State Defendants and violation of 42 U.S.C. § 1983 (violation of her constitutional right to equal protection) with respect to Defendant Matthews in his individual and official capacities.[1] For the reasons stated below, the State Defendants' Motion for Summary Judgment is granted as to the claims against both the State Defendants and Defendant Matthews individually.

### Background

Defendant Mark Matthews ("Matthews") is, and at all times relevant to this matter was, a professor of philosophy at

---

1. The Complaint alleged several other causes of action against the Defendants, but those causes of action were dismissed by this Court pursuant to an Order dated June 21, 1999 (Doc. No. 75).

Defendant Metropolitan State University ("Metro State"). Plaintiff Randi Waters ("Waters") enrolled as a student at Metro State in January of 1995 and took a course from Matthews during her first term.[2] She received an "A-," and Matthews allegedly encouraged her to major in philosophy or ethics. The following quarter (Spring of 1995), Waters took an independent study course under Matthews' advisement. Shortly after the Spring 1995 term commenced, Waters experienced a profound personal tragedy which interfered with her ability to complete her coursework. Waters withdrew from one registered course, failed a second, and took an incomplete for the independent study with Matthews. Ultimately that incomplete lapsed without Waters completing any work for the course.[3]

Waters took no further courses from Matthews. Although she never officially declared a major in philosophy, she listed "philosophy" as her intended course of study on a financial aid application. In the Complaint, Waters maintains that Matthews was her advisor during the Spring of 1995; however, Waters has offered no explanation for the University's records which list her advisor as someone other than Matthews (a Wang Ping).

In the Complaint, Waters alleges that Matthews offered to give her a grade for the incomplete course even though she had not finished the work. She further alleges that she wanted to enroll in several philosophy classes in the Fall of 1995—classes taught by Matthews—but he discouraged enrollment to facilitate his pursuit of a relationship with Waters. Waters did not report either of these alleged actions to the University.

Waters continued to enroll in courses during the fall term of 1995, winter of 1996, and spring of 1996. However, Waters did not successfully complete any of these courses, either failing or withdrawing from them all.

Throughout this time period, the relationship between Matthews and Waters developed. During the fall term of 1995, Waters spoke on several occasions with Matthews regarding her personal problems and their interference with her school work. In January of 1996, Matthews propositioned Waters by indicating that he was getting a divorce and asking her to take a trip with him to Las Vegas; Waters declined. Later that month, however, Waters took a trip to Puerto Rico in an effort to resolve some of her personal problems; before leaving, she named Matthews as decision-maker for her children in the event something should happen to her during her travels. During March of 1996, Matthews had repeated meetings and phone conversations with Waters. During these conversations he indicated his continued desire for a sexual relationship with Waters. Waters alleges that he expressed fear that such a relationship with a student would amount to sexual harassment and would threaten his ability to obtain tenure. Eventually, Waters asserts, he began urg-

**2.** Waters was a transfer student from the University of Minnesota. Although her transcripts from the University of Minnesota are not in the record, she has represented and the Defendants have not denied, that she was an average to above-average student at the University of Minnesota.

**3.** Waters asserts that she could have received an indefinite extension for the course and that Matthews could have given her a grade for the course at any point for several years following the "lapse," and therefore Matthews retained supervisory control over Waters. The record does not support such an assertion. First, the "Policies and Procedures" guideline specifically states that "[s]tudents may request one 90-day extension [for completion of an independent study] with their instructor's approval. (No more that one extension.)" Leah Harvey, Metro State's Vice President for Student and Academic Affairs, testified in her deposition that a student, through her instructor, could appeal a lapsed independent study at any time, even two to three years after the lapse. However, there is nothing in the record to suggest that Waters was making strides towards completing her independent study or was at any point contemplating such an appeal.

ing Waters to withdraw from Metro State so they could pursue a sexual relationship without any repercussions. At this time, he allegedly informed Waters that he would provide stability for Waters and her two young children. Waters continued to resist Matthews' advances. In April of 1996, Waters consented to Matthews' plan: she withdrew from Metro State and began a sexual relationship with Matthews.

The Complaint suggests that, by withdrawing from Metro State in the Spring of 1996 without taking care of her "incompletes," Waters lost her eligibility for federally subsidized financial aid. Thus, Waters was unable to transfer to another university to complete her studies.

In January of 1997, Waters ended the relationship with Matthews. Matthews allegedly called her names ("crazy," "fucking bitch") and indicated that if Waters filed a complaint against Matthews, she would be the object of derision. Furthermore, Matthews allegedly threatened to "ruin" Waters if she made their affair public.

In March of 1997, Waters called Metro State's affirmative action office and was advised by the intake person (Juan Moreno) that the situation she described was indeed sexual harassment (she had not told Moreno who the perpetrator was). She filed a sexual harassment complaint with the University.

Waters alleges that Moreno, after learning the name of the accused, interrogated her regarding her relationship with Matthews in a hostile manner. Moreno purportedly asked Waters about her relationship with her father and any prior therapy and told Waters that children who are abused tend to pass on that abuse. Waters further alleges that she was pressured into signing a statement which mischaracterized her relationship with Matthews as "consensual"; Waters alleges that she told Moreno that she felt pressured into having a relationship with Matthews because of his power over her and because of her particularly vulnerable situation. Waters alleges that Moreno did not inquire of the

two witnesses identified by Waters, but rather limited his inquiry to talking with Waters and Matthews. On May 21, 1997, administrative official Leah Harvey informed Waters via mail that Metro State had found insufficient evidence of sexual harassment; Matthews was told not to engage in such behavior again. Waters was discouraged from taking future classes with Matthews and was, according to the Complaint, thereby limited in her ability to pursue a degree in philosophy or ethics.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

## 2. Waters' Claims

■ Waters has asserted a claim for damages against Metro State premised upon her allegation that she was sexually harassed by Matthews and that Metro State did not take adequate action to protect her from Matthews; a claim for damages against Mark Matthews in his individual capacity premised upon her allegation that she was deprived of equal protection of the laws when, under color of state law, Matthews sexually harassed her[4]; and a claim for injunctive relief against Metro State premised upon her equal protection claim against Matthews. All of Waters' claims, then, turn on her assertion that she was the victim of unwelcome sexual harassment by Mark Matthews.[5] Ms. Waters' claims all fail, as a matter of law, because she has offered no evidence that her relationship with Matthews was unwelcome.

The Court recognizes that "the relevant question is not whether [Waters] voluntarily participated in sexual relations, but rather whether the advances were unwelcome.... To distinguish between an actual desire for a relationship on one hand, and a mere acquiescence to tendered sexual advances on the other, it is necessary to consider the power disparity between the individuals involved." *Kinman I,* 94 F.3d at 468 (citations omitted). Indeed, the

analysis typically turns on determinations of credibility and should be left to a trier of fact. *Id.* In the case at bar, however, there is no evidence whatsoever that the relationship was unwelcome.

Waters asserts that she was "uncomfortable" with the evolution of her relationship with Matthews from teacher-student to romantic couple. She has testified that she was "shocked" when she learned that Matthews was interested in her sexually. Moreover, she has testified that, on her first visit to Matthews' apartment, she expressed her discomfort with his physical advances and indicated that it was "too much, too fast." However, the facts do not support a conclusion that Waters "merely acquiesced" to Matthews advances. Waters actively encouraged a private, personal relationship with Matthews, going so far as to name him decision-maker for her children in February of 1996. Waters returned to Matthews' apartment repeatedly, securing child-care for her daughter for each such visit.

■ Title IX case law, and Ms. Waters' brief, require the Court to consider the alleged power disparity between Waters and Matthews. In that regard, the Court notes that Waters was an adult student, somewhat older than the "typical" college student. Moreover, Waters was no longer taking a class with Matthews, had not named him her official advisor, and had not been actively pursuing her studies at Metro State at all. Waters may have en-

---

4. See *Kinman v. Omaha Public School District* (*Kinman II*), 171 F.3d 607, 611 (8th Cir. 1999) (finding that a student could assert a § 1983 claim premised on the 14th Amendment against an individual teacher where the teacher's sexual conduct towards the student amounted to a deprivation of constitutional rights). The Court notes that the standard for bringing such a claim, however, will be at least as stringent—if not more so—than the standard for asserting a claim under Title IX. In other words, if conduct does not amount to sexual harassment for Title IX purposes, it cannot form the basis for a claim premised upon constitutional protections.

5. To assert a claim of hostile environment harassment under Title IX, Waters must show: (1) that she is part of the class of individuals protected by Title IX; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently sever as to alter the conditions of her education and create an abusive educational environment; and (5) that some basis for institutional liability—here, the University's alleged deliberate indifference to Waters' situation—has been established. See *Kinman v. Omaha Public School District* (*Kinman I*), 94 F.3d 463, 467 (8th Cir.1996), *rev'd on other grounds,* 171 F.3d 607 (8th Cir.1999) (*Kinman II*).

tertained some notion of pulling her life together and focusing on her studies again, may have even considered the possibility of naming Matthews as her advisor. However, Waters may not rely upon a power disparity which might have arisen in the future. At the time of Matthews' romantic overtures, there was no legitimate academic relationship between Matthews and Waters.

For evidence of the power disparity between Matthews and Waters, Waters further points to her vulnerability in the wake of her boyfriend's suicide in the Spring of 1995. While the Court recognizes that such an event would be deeply traumatic, it strains credulity to suggest that Matthews preyed upon that event when, nearly a year later, he expressed a romantic interest in Waters.

Again, the Court does not intend to minimize the severity of Ms. Waters' tragedy or to condone, either explicitly or implicitly, Mr. Matthews' behavior. But, taking the evidence in the light most favorable to Ms. Waters, a reasonable jury simply could not conclude that Matthews' advances were unwelcome as a matter of law. As a result, summary judgment on all of Waters' claims is appropriate.

■ Even if the Court were to determine that a reasonable fact-finder could conclude that Matthews' advances were unwelcome, summary judgment on Waters' Title IX claim would still be appropriate because Waters has failed to show that the University responded to actual knowledge of harassment with deliberate indifference.

■ A private litigant can only collect damages under Title IX if the institution had actual knowledge "of discrimination in the recipient's programs" and responded with deliberate indifference to the discrim-

ination. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277 (1998). There is no question that the University had actual knowledge of the relationship between Waters and Matthews, at least in 1997 when Waters contacted the University Office of Affirmative Action.

With respect to the 1997 complaint, the State Defendants argue and the Court agrees that the record cannot support a finding of deliberate indifference on the part of the University. Despite Waters' assertion that the investigation was a mere sham which had the effect of revictimizing her, the record is clear that Waters never asserted to the University that Matthews' sexual advances were unwelcome. Rather, she herself referred to the relationship as "consensual" [6] and told the investigator that she had been attracted to Matthews, that she had willingly gone to Matthews' house to engage in sexual relations.

Waters notes that the University did not question anyone other than Waters herself and Matthews. While the Court agrees that such an investigation seems to be incomplete, Waters has offered no evidence that a more thorough investigation would have revealed information which would have changed the University's position. Waters seems to assert that the University should have spoken to the student with whom Matthews had previously had an affair and with Matthews' ex-wife, who had been an intern at Metro State when the couple met. The depositions of those individuals, however, reveals that neither relationship was unwelcome. Certainly there is evidence that Matthews behaved badly in and following those relationships, but, as the University points out, being a bad boyfriend or spouse is not legally actionable.

6. Waters asserts that the University should not be allowed to eschew responsibility because of the presence of a few "magic words" in Waters' formal complaint. The Court disagrees with this characterization of the University's argument. In the context of sexual harassment in the college or university environment, "consensual" is not merely a magic word. Rather it is a characterization of behavior which, if a true characterization, removes the behavior from the threat of statutory sanction. The University was legally justified in relying upon Ms. Waters' own assertions that the affair was consensual.

In short, while the Court may wish that the University's investigation procedures were a little more thorough, the Court finds that the evidence simply does not support a finding of deliberate indifference on the part of the University. Accordingly, the failure of Ms. Waters to establish the elements of a Title IX claim as defined by *Gebser* provides an alternative basis for summary judgment on Waters' Title IX claim.

In closing, the Court wishes to emphasize that it finds the behavior of Mr. Matthews offensive. That a professor would repeatedly seek out the romantic company of students,[7] whether such attention is welcome or not, undermines the integrity of the department in which he teaches, the university which provides the forum for such behavior, and, indeed, the entire system of higher education. While such behavior, where ostensibly welcome and where not in the context of a direct teacher/student or advisor/advisee relationship, is not actionable under existing federal law, it should not be condoned. In the absence of a statutory prohibition on such behavior, the Court would hope that colleges and universities would take steps to police such activities internally, to set higher standards than those required by law so as to insure an academic environment which is devoted utterly to the goals of learning and education rather than to the amorous pursuits of its professors.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. State Defendants' Motion for Summary Judgment (Doc. No. 83), in which Defendant Mark Matthews joined (Doc. No. 85) is **GRANTED** and the **COMPLAINT IS DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

7. The Defendants make much of the fact that one of Mr. Matthews' romantic conquests was an intern—actually a student at another state university—and not a student of Metro State. It is a distinction without a difference. Matthews may have had no direct authority over this intern, but she was nevertheless a person utilizing Metro State for an educational experience.