Irina FREDERICK, Plaintiff,

v.

SIMPSON COLLEGE and Steven Rose, Defendants.

No. Civ. 4:99–CV–10090.

United States District Court,
S.D. Iowa,
Central Division.

April 4, 2001.

Joseph A. Renzo, Anthony F. Renzo, Babich, Goldman, Cashatt & Renzo, PC,

Des Moines, IZ, Victoria L. Herring, Herring Law Office, Des Moines, IA, for Plaintiff.

Philip H. Dorff, Jr., Hopkins & Huebner, Des Moines, IA, Elizabeth Gregg Kennedy, Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, IA, for Defendant.

Frank B. Harty, Kathryn Atkinson Overberg, Nyemaster, Goode, Voights, West, Hansell & O'Brien, PC, Des Moines, IA, for Defendant.

## ORDER

LONGSTAFF, Chief Judge.

Before the Court now are defendants' motions for summary judgment. Simpson College, defendant, filed its motion on November 15, 2000, and Steven Rose, defendant, filed his motion for partial summary judgment on the same day. Plaintiff replied to both motions on March 7, 2001. Rose then filed a reply brief on March 15, 2001, and Simpson College did likewise on March 19, 2001. Oral argument has been requested, but found unnecessary. The motions are fully submitted.

Frederick filed her complaint in this Court on February 18, 1999. Plaintiff has since filed an amended complaint, which was allowed by order of Chief Magistrate Judge Walters on February 23, 2001. Count I alleges a violation of Title IX, and Count II a breach of contract, both against Simpson College. Count I includes a claim that Simpson College retaliated against Frederick after she complained of sexual harassment by Rose. Counts III–V allege that Rose committed assault and battery, and that he intentionally inflicted emotional distress upon Frederick. Count VI, which is misnumbered in the amended complaint as Count VII, alleges a claim of negligent hire, supervision and/or retention against Simpson College. The motion

for summary judgment by Simpson College addresses plaintiff's Title IX claim, while Rose has moved for summary judgment with respect to plaintiff's claim for intentional infliction of emotional distress.

## I. BACKGROUND

The following facts are either undisputed or viewed in a light most favorable to plaintiff. Plaintiff, Irina Frederick, was born and raised in Moscow, Russia. She graduated from a university in Russia, and taught school to children in grades 4–9. She immigrated to the United States in 1992 and got married. By 1997, the record reflects that she and her husband were raising two children. The record also shows that by this time, she had decided she wanted to obtain a permanent teaching certificate in this country.

In order to progress toward a permanent teaching certificate, she enrolled in a class entitled "Foundations of Education" at defendant, Simpson College in Indianola, Iowa, in the summer of 1997. Simpson is a private college that receives federal funds. Ten students enrolled in the "Foundations of Education" class, which required both in-class time and a practicum experience. The in-class time began in late May and ran through the end of June 1997, and the practicum experience for each student was undertaken later in the summer. The course was taught by the other defendant in this case, Professor Steven Rose.

Rose was an untenured professor in the education department at Simpson College. Evaluations that had been completed by students in other classes that Rose had taught prior to May 1997 indicated that he sometimes used profanity or inappropriate language. Rose was aware that he had been criticized by students for his language.

Frederick was not a full-time student at Simpson, nor did she take any other classes at that time. She was not provided with a student handbook from Simpson College. At the time she enrolled in Rose's course, Frederick was 35 years old.

On the first day of class, Rose introduced himself to the students, and explained the expectations of the class. In making this introduction, Rose made a statement that if they wanted to succeed in the class then they would have to be his friend. Frederick was offended by this comment, and she noted her displeasure in the "Student Profile" form that she typed up.[1] A question on the form asked whether she had "any major concerns" about taking the course. In response, Frederick answered: "Professor's statement that the students have to be his friends if they want to complete this course successfully. I do not understand why being Professor Rose's friend is required to pass the course, and I do not know the responsibilities of being his friend."

After Rose reviewed Frederick's student profile, he alerted Jacqueline Crawford, the chair of his department, about the concern Frederick expressed. Crawford and Rose agreed that he would address the concern with Frederick. However, he did not address the concern with Frederick individually; rather, Rose went before the class during their second meeting and clarified that when he said they were required to be his friend, he meant that at the end of the class they would have treats in class together.

As the course progressed, Frederick alleges that the class was subjected to language by Rose that was inappropriate. Rose would use swear words or other vulgar language. Rose also made general comments during class about sexual activity, even going so far as to personalize the subject. Examples of such comments[2] made by Rose during class are: (1) "I told my daughter, don't screw around! If you do, have him wear a condom!"; (2) "If I had a couple of beers and was walking down a street all lined with brothels—a prostitute behind each window—and I saw a beautiful young woman in a window—I might not have come home that night."; (3) he told the class he was "a heterosexually active man" and while he "may not be a good lover" that he was comfortable with the way he makes love; (4) he told the class he would be flattered to be sexually harassed, or that he would not mind being pinched by a student or to "pinch her on her little hiny—I like it!"; and (5) when he was asked by someone in the class what he would do if a student put his arms around him and kissed him, he stated "I probably would say thank you." Additionally, Frederick has reported that Rose would refer to his private and confidential conversations with Frederick in front of the whole class, and this would make her feel uncomfortable.

---

1. *See* Plaintiff's Appendix to Plaintiff's Resistance to Defendants' Summary Judgment Motions, Exh. 55 (hereinafter Plaintiff's Appendix). The "Student Profile" appears to be a standard form used at Simpson College near the beginning of courses. At the top of the two-page form, it states: "Please answer the following questions briefly. With the information compiled from these profiles, your professor will attempt to personalize some instruction and assignments. This information will be kept confidential." *Id.*

2. The Court does not deem it necessary to recount every statement involving sex that plaintiff alleges Rose made during the course of the class. For purposes of the summary judgment motions now before it, the Court recognizes that the facts viewed in a light most favorably to plaintiff clearly indicate that Rose used profanity and involved sex as a topic in the classroom.

Frederick also states that, beyond the inappropriate language Rose used, she was subjected to inappropriate conduct from Rose. Examples of the inappropriate conduct include the following: (1) while on a break during the class,[3] Rose made a comment to two male students that sex was a great, healthy and fascinating activity between people that had real chemistry, and that he made this comment while staring at her, (2) during another classroom break outside, Frederick states that Rose walked behind her so closely that she could feel his breath on her neck and he said to her, "Love your car;" (3) on another occasion before the entire class, Rose imitated a movement indicative of a man masturbating; (4) Frederick believes that Rose would stare at her lips or crotch areas when he was talking to her; (5) he would become visibly angry if she engaged in friendly activities with other students in the class; and (6) Frederick believed that there were times during the class that Rose was attempting to attract her attention.

A number of the statements made by Rose during the class, and some of the conduct Frederick attributed to Rose, has been corroborated by another student, Barbara Tidwell. See Plaintiff's Appendix, 00128–00130 (Affidavit of Barbara Tidwell). Tidwell listed a number of the same sexually related statements that Frederick states Rose made during the class. Tidwell states that Rose mentioned during class that he was "not happy in his marriage." Id. Additionally, Tidwell states that Rose would often refer "to his private and confidential conversations with Irina [Frederick], which seemed to make her uncomfortable." Id.

Amidst the on-going offensive language and conduct by Rose, approximately halfway through the in-class experience in June 1997, Frederick decided to give Professor Rose a gift—a book[4] and a letter. In the letter, she stated that she enjoyed the class and she was learning a lot. She also stated she enjoyed the class "because you've made me feel like a teenager again, I mean the good part of being a teenager. Thank you for that." See Plaintiff's Appendix, Exh. 3. At the end of the letter, she stated, "This is a personal letter. You do not have to put it in my file unless the law dictates that." Id. In response to this gift, Rose wrote a letter to Frederick thanking her for the book.[5] Rose also states that he told Crawford, his department chair, about the book and letter.

After the last in-class experience, near the end of June 1997, Rose invited Frederick to call him anytime if she needed anything. He said this to her before she left the classroom. Shortly after class was over, Frederick came out of a restroom in the college building and met Rose again in the hallway. He accompanied her as they walked out of the building. Frederick states that Rose was speaking with her in an intimate tone until they ran into a fellow student in the class, and he then changed to a businesslike manner. As he left, she states that he reminded her that she could call him if she needed anything.

3. The class was a three-and-a-half hour night class. Some members of the class took classroom breaks on an outdoor porch, and Rose joined them.

4. It is unclear to the Court what the title or subject of the book was, other than it appears that it dealt with Russian or Soviet life.

5. The gist of Rose's letter to Frederick dealt with the cultural differences in the educational system that Frederick was forced to deal with, and that he was sympathetic to her plight. See Simpson College's Statement of Undisputed Facts (Exhibit entitled "Letter to Frederick from Rose").

Despite the fact that the in-class experience was over, the students still had a take-home examination to complete in addition to the practicum. While completing the examination, Frederick had a question about an abbreviation Rose had included in the test. She called him, and he answered the question. Frederick states that she was ready to end the conversation after he answered her question, but that Rose continued the conversation and went on to state that she was still welcome to call him. Frederick reports that Rose told her this in a playful manner. Frederick replied that she did not think she would need anything else, and she felt uncomfortable with his invitation to continue to call him.

Frederick states that after this phone call, she believed that Rose may have misinterpreted the note she gave him which accompanied her gift to him. She states she wanted to clear up any misinterpretation of her note, or any idea that Rose had that she was interested in a romantic relationship with him. She also wanted to tell Rose how he made her feel uncomfortable. She called up Rose to arrange a meeting to coincide with the time she would turn in her take-home examination. They decided they would meet in his office on June 30, 1997 at 4:30 p.m.

Upon arriving at the office to turn in her exam, Frederick told Rose she had changed her mind and that she did not feel like having the meeting. They engaged in a brief conversation, and Frederick told Rose that she was instead going to HyVee grocery store. Rose agreed to meet her in the HyVee parking lot in twenty minutes to discuss matters. Rose suggested they meet at the HyVee parking lot. He states that he met her at such a place because he believed Frederick might be a victim of abuse, and he thought it might provide a safe meeting place outside of his office.

Frederick states that she was willing to speak with him there because she wanted to clear up any misconception Rose may have had that she wanted anything more than a professional relationship with him.

When they arrived at the HyVee parking lot, Rose pulled up next to Frederick's car. Rose got out of his car and into her car. Frederick asked him if he would drive the vehicle around the block, and Rose agreed. Frederick states she did not want to sit in the parked car because she had a headache and the sun was in her eyes, and she did not want to drive herself because of the headache. Rose took the vehicle out on a highway that leads out of town. During this drive, Frederick told Rose that she did not want to be out on the highway. She also told him that he made her feel uncomfortable during the class. Rose told her that he was a happily married man, and she told him that she was a happily married woman. Frederick states Rose went on to exclaim that he found her to be attractive, and that he said this while looking her up and down. The drive lasted for approximately ten minutes. Upon returning to the HyVee parking lot Rose exited her car. Frederick claims that as he got out of the car he told her, "Let's talk about it sometime. Okay?" Frederick interpreted this to mean that Rose was interested in engaging in a sexual relationship with her.

After the meeting in the car, Frederick called Rose four times that evening. *See* Rose's Statement of Undisputed Facts, Exh. B (phone records). She spoke with him on two occasions that night. She states that she wanted to make clear again that she did not want anything beyond a professional relationship with him. Both conversations were very brief. Later, Rose reported the HyVee incident to

Crawford, his department chair.[6]

After the incident, Frederick still had her practicum experience to complete to successfully finish the course. There were some problems with scheduling this experience for her; Frederick alleges Rose created the problems. They had conversations in July and August about the practicum, and other things to finish up the class. Further, Frederick alleges Rose delayed releasing her grade for the course. Frederick eventually received a "B" in the course.

In August or September 1997, Frederick began researching graduate schools she was interested in attending. Frederick asked Rose to write letters of recommendation to graduate schools for her, as his class was the only college course she had taken in this country. Rose agreed to write the recommendation letters, and over the ensuing fall and winter he wrote these on her behalf. It is undisputed that they had several phone conversations and meetings about the letters. During these meetings, Frederick alleges that Rose tried to get physically close to her. She states that he caused their heads to touch, touched her ankle with his ankle, and offered handshakes for extensive periods of time. Frederick states that she was uncomfortable and increasingly upset by Rose's behavior, but felt that she needed

his letters of recommendation to get into graduate school.

On February 4, 1998, Rose and Frederick met again regarding recommendation letters. During the meeting, Frederick states that Rose came "cheek to cheek" with her. At the end of this meeting, the parties engaged in a hug. Frederick claims that when they hugged, she could feel that Rose had an erection.[7]

After this February 4 meeting, Frederick states she realized that Rose was not going to stop making his advances on her. Frederick called Rose and told him she was not going to use his recommendation letters, and that she did not want to use him as her recommender any more. She later mailed all of the recommendation letters Rose had written back to him. Then, on February 24, 1998, Frederick wrote a letter to Bruce Haddox, assistant dean of academic affairs for Simpson College, complaining about her experiences with Professor Rose.

Haddox referred Frederick's complaint to Mimi Bartley, human resource director for Simpson College, for investigation. This investigation occurred in March 1998, and Bartley issued a report to Haddox on April 2, 1998. The report concluded that Frederick may have been offended by language and remarks made by Rose, but that they were not generally offensive or unwelcome. "The investigation did not re-

---

**6.** Plaintiff asserts that Bruce Haddox, assistant dean of academic affairs for Simpson College, had knowledge of the HyVee incident involving Rose and Frederick. Plaintiff states that Haddox "expressed no concern whatsoever for the well-being of Irina, instead advising Dr. Rose to 'be careful.'" *See* Plaintiff's Statement of Facts, page 12. Plaintiff cites to exhibit 15 and pages 15 and 16 of Haddox's deposition as support for this proposition. However, the Court has reviewed these pages in plaintiff's appendix, along with the record in general, and cannot find where in the record it reflects a statement by Haddox inform-

ing Rose to "be careful." Other evidence does indicate that Haddox was aware of the HyVee incident in the summer of 1997. *See* Plaintiff's Appendix, Exh. 18 (Bartley investigative report).

**7.** Frederick also alleges at another private meeting in February 1998, Rose referred to himself as her informal advisor and suggested that how she progressed in her education depended on how happy she kept her advisor. It is unclear when or where this meeting allegedly took place.

veal a severe or pervasive sexually hostile educational environment, especially in light of the fact that the typical college classroom is not expected to be a pristine environment." *See* Plaintiff's Appendix, Exh. 18. The report stated that Bartley had told Rose to avoid vulgar and suggestive language in the classroom, and that it was "not advisable to meet with students in private settings such as a vehicle in a parking lot." *Id.*

As a result of her complaint and the investigation, Frederick alleges that Simpson College retaliated against her. She applied for an independent study course and was denied. She alleges that faculty and students became aware of her complaint and treated her differently. Frederick filed her complaint in this Court on February 18, 1999.

Sometime after Simpson College completed its investigation in April 1998, Frederick's son tragically died. He drowned in a pond on the family farm. Frederick alleged that Rose's sexual harassment of her caused her to feel so distraught that she was not able to properly supervise her children.

Additionally, in the record now before this Court, plaintiff has included the opinion of Billie Wright Dziech, Ed.D, an expert in the area of sexual harassment. Dziech, in a written opinion, stated that he found "the language and behaviors of Dr. Rose and the response of Simpson College unusually egregious." *See* Plaintiff's Appendix, Exh. 70.

His continual references to sex in general and his own sexual experience in particular bore no conceivable relation to the material he was teaching in Foundations of Education. His use of his hand to imitate masturbation as a means of describing a high school student's suspension is beyond the bounds of propriety as a teaching technique and would obviously create a hostile environment for the average female and probably for most male students in the presence of females. Ms. Frederick's complaints that Dr. Rose stared at her in public, invaded her space, and engaged in unwelcome body contact while they met privately clearly described situations which a typical student would find intimidating, hostile and offensive.

*Id.* Dziech went on to state, "Based on the information I have reviewed, it is my opinion that Simpson College flagrantly violated Ms. Frederick's rights and mishandled her complaint."

Plaintiff also submitted a 34 page supplemental opinion by Dziech. *See* Plaintiff's Appendix, at 00263. In this report, Dziech is critical of not only Rose's behavior, but also clarified how it was his opinion that Simpson's administrative system is not properly designed to discover the complaints of students; how Simpson did not investigate this situation with Frederick and Rose in a timely fashion; and how Simpson poorly handled the investigation in March 1998 following Frederick's written complaint to Assistant Dean Haddox.

## II. APPLICABLE LAW & DISCUSSION

### A. Standard of Review

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B. Title IX Claim Against Simpson College

"Title IX provides that, '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .' " *Morlock v. West Cent. Educ. Dist.,* 46 F.Supp.2d 892, 903 (D.Minn.1999) (quoting 20 U.S.C. § 1681(a)). Two objectives underlie Title IX: " '[t]o avoid the use of federal resources to support discriminatory practices' " and " 'to provide individual citizens effective protection against those practices.' " *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

Title IX is distinguishable from Title VII. The body of law under Title VII applies to employers and its objective is to " 'eradicat[e] discrimination throughout the economy.' " *Gebser,* 524 U.S. at 286, 118 S.Ct. 1989 (quoting *Landgraf v. USI Film Products,* 511 U.S. 244, 254, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Title VII clearly provides for a private cause of ac-

tion, and the chief aim of Title VII is to compensate victims of discriminatory practices. *Id.* at 287, 118 S.Ct. 1989. Title IX's statutory means of enforcement, however, is primarily administrative. It directs federal agencies that distribute education funding to establish requirements to ensure that those entities receiving the benefits of the funding do not discriminate. *Id.* at 280, 118 S.Ct. 1989. It was not until *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) that the Supreme Court recognized an implied private right of action under Title IX, and not until *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) that it was established that monetary damages are available in a Title IX claim.

Then, in *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the United States Supreme Court addressed the issue of when a school may be held liable for the independent misconduct of a teacher. The case involved a ninth grade teacher, Frank Waldrop, and a female student, Gebser. The two met in the spring of 1992, before Gebser's ninth school year, in a book discussion group. The two began a sexual relationship the following summer. *Id.* at 277, 118 S.Ct. 1989. In the fall of that year, Gebser was a student in classes taught by Waldrop while they still continued a sexual relationship. In the classes, Waldrop made inappropriate remarks and suggestive comments which were directed at Gebser. Two parents complained about the comments in October 1992, and the high school principal held a meeting. Waldrop apologized for the comments, and was warned by the principal. *Id.* at 278, 118 S.Ct. 1989. In January 1993, a police officer discovered Waldrop and Gebser having sexual intercourse and arrested Waldrop. *Id.* Gebser never reported the relationship to school officials at any prior time. *Id.*

She and her mother later filed suit under Title IX seeking monetary damages.

The *Gebser* Court refused to expand liability under Title IX to include the concepts of respondeat superior or constructive notice that apply in Title VII cases. *Gebser*, 524 U.S. at 287–88, 118 S.Ct. 1989.[8] *Gebser* held that a school can be held liable for damages under Title IX for a teacher's sexual harassment of a student only if actual notice and deliberate indifference are shown. *Id.* at 292, 118 S.Ct. 1989. The holding was based on the fact that Title IX is "primarily designed to prevent recipients of federal financial assistance from using the funds in a discriminatory manner" and not to provide compensation to victims. *Id.* Title IX has been described as based upon a theory of contract between an entity receiving funds and the government giving funds, a different concept than that of Title VII. *See generally Gross v. Weber*, 186 F.3d 1089, 1092 (8th Cir.1999).

 To prevail on a claim of sexual harassment under Title IX in this case, Frederick must make a showing of either quid pro quo harassment or hostile environment sexual harassment. "Quid pro quo harassment arises when the receipt of benefits or the maintenance of the status quo is conditioned on acquiescence to sexual advances." *Kinman v. Omaha Public School Dist.*, 94 F.3d 463, 467 (8th Cir. 1996) (citation omitted). "Hostile environment sexual harassment occurs when unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct have the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile or offensive environment." *Id.* To establish a prima facie case of either type of sexual harassment under Title IX, Frederick must show: 1) she was subjected to quid pro quo sexual harassment or a sexually hostile environment;[9] 2) a Simpson College official with authority to take corrective measures had actual knowledge or notice of the sexual harassment; and 3) despite such knowledge, the Simpson College official was deliberately indifferent to the sexual harassment and failed to reasonably respond. *See Morse v. Regents of the Univ. of Colorado*, 154 F.3d 1124, 1127 (10th Cir.1998) (stating the Title IX prima facie case after *Gebser*); *see also Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir.1999) (briefly noting *Gebser's* requirements of actual notice to, and deliberate indifference by, the school district) and *Gordon v. Ottumwa Community Sch. Dist.*, 115 F.Supp.2d 1077, 1081 (S.D.Iowa 2000) (same).

Simpson College, in its motion for summary judgment, has focused the Court's attention on the second and third prongs of plaintiff's prima facie case. Therefore, the Court need not address whether there is a material issue of fact that plaintiff was subjected to quid pro quo or hostile environment sexual harassment by Rose. The

---

8. "[I]t would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." *Gebser*, 524 U.S. at 285, 118 S.Ct. 1989.

9. To show that she was subjected to sexual harassment, Frederick must establish that:

(1) she is part of a protected class; (2) she was subjected to unwelcome sexual harassment, either quid pro quo or hostile environment; (3) that the harassment was based on sex; and (4) that the harassment was sufficiently sever as to alter the conditions of her education and create an abusive educational environment. *See Waters v. Metropolitan State Univ.*, 91 F.Supp.2d 1287, 1291 n. 5 (D.Minn.2000).

questions now before the Court are whether there are material issues of fact that Simpson College had "actual notice;" and if they did, whether its actions in response indicated "deliberate indifference."

### 1. Notice

As noted by Chief Magistrate Judge Walters of this district in his thorough discussion of the actual notice aspect of Title IX, "[i]t is difficult to define what kind of notice is sufficient." *Gordon,* 115 F.Supp.2d at 1082 (examining requisite notice a school district must have to be found liable under Title IX in a case involving claims of sexual abuse of an elementary student by an individual who was employed by the school as a substitute crossing guard and substitute teacher associate).[10] Furthermore, "[a]lthough the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista Independent School District,* its contours have yet to be fully defined." *Crandell v. New York College of Osteopathic Medicine,* 87 F.Supp.2d 304, 320 (S.D.N.Y.2000). In the college or university setting, notice can be particularly difficult to define. There are often more levels of administration at a college or university than there are in an elementary or secondary school. The Court also notes that a different manner and level of oversight is provided by a college or university administration, as the students are adults and generally not children.[11]

### a. Who Must Have Had Notice

■ Under Title IX, notice must be to an "appropriate person" who has a minimal level of authority. *See Gebser,* 524

U.S. at 290, 118 S.Ct. 1989 (quoting 20 U.S.C. § 1682). "[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond." *Id.* However, "*Gebser* did not discuss who might be an official with such authority." *Litman v. George Mason Univ.,* 131 F.Supp.2d 795, *798* (E.D.Va.2001) (quoting *Floyd v. Waiters,* 171 F.3d 1264 (11th Cir.1999)). In *Litman,* the court stated that "the contract theory underlying Title IX severely limits who can be considered an 'appropriate person' under § 1682," and that "the bulk of employees" are excluded from being such an appropriate person. *Id.* The judge in *Litman* went on to conclude that another professor was not an "appropriate person" for purposes of providing the university with actual notice under Title IX. *Id.* at 799–800.

In *Liu v. Striuli,* 36 F.Supp.2d 452 (D.R.I.1999), the district court concluded that an appropriate official of the college did not have actual knowledge of the sexually harassing behavior of one of its professors. Liu, the student victim, alleged that the director of financial aid for Providence College, defendant, did have actual knowledge of sexual harassment by the offending professor. The *Liu* court concluded that the director of financial aid did not have power to discipline the professor, and that any duty the director of financial aid to report the behavior of the professor was no more than that of every employee of

---

**10.** While *Gordon* did not address sexual harassment, it is a Title IX case and persuasive with respect to the notice requirement.

**11.** A college or university does not assume the same paternalistic role over its students as

elementary and secondary schools. *See generally Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (addressing student-to-student sexual harassment under Title IX law).

the college. *Id.* at 466. Further, while Liu alleged that the director of the graduate history department also had knowledge, the court found this director was not an "appropriate person" because the offending professor taught in the department of modern languages. *Id.*

In this case, the record reveals there were at least two levels of administration overseeing Rose. Jacqueline Crawford provided a form of immediate oversight as the chair of Rose's department. Assistant Dean Haddox had a broader responsibility to oversee faculty at Simpson College. The Court finds that both of these officials of Simpson College qualify as an "appropriate person" for purposes of Title IX liability. This is not a case like *Liu* where the officials did not have authority to discipline the professor, nor a case like *Litman* where the alleged official was merely a colleague of the professor. Both Crawford's and Haddox's responsibilities required them to be more than a colleague or friend to Rose. The record indicates Haddox had broad authority to address problems and institute corrective measures, and Crawford had authority within her department to intervene at some level to stop harassment if she knew it was occurring.

### b. Whether Notice to Crawford or Haddox Was Sufficient, and When an Appropriate Person Had Actual Notice

In general, this Court agrees with Judge Walters in *Gordon* when he defined what kind of notice must be possessed by the appropriate person to invoke Title IX liability. He stated that "actual notice 'requires more than a simple report of inappropriate conduct' on the part of a school employee but 'the ... standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report'" from the student. *Id.* (quoting *Doe v. School Admin. Dist. No. 19,* 66 F.Supp.2d 57, 63 (D.Me.1999)). In *Gordon,* the plaintiff alleged she had been sexually abused by an individual named "Grampa Skinner," who served as a substitute crossing guard and substitute teacher associate at her elementary school. Plaintiff alleged there were three prior incidents which provided the school district with requisite notice that Skinner would sexually abuse a student. The first prior incident was a report that Skinner slapped a student. Second, there was a report by a child that Skinner had slapped her thigh. And third, plaintiff alleged the school district had actual notice as a result of an investigation that occurred after a child reported that Skinner had extensively hugged her and kissed her on the lips. *Id.*

Judge Walters in *Gordon* concluded that the first two instances could not have provided the school district with notice. The "thigh slapping" incident was investigated by the principal and found to be innocent, while the other "slapping" incident gave no notice of a likelihood that Skinner would engage in sexually abusive behavior. *Id.* The court concluded, however, that the other reported incident where Skinner allegedly extensively hugged her and kissed her on the lips left a material issue of fact for the jury to determine whether the school had actual notice that Skinner presented a risk of engaging in sexually inappropriate conduct with a student. *Id.*

In this case, two appropriate persons allegedly received actual notice. The first is Crawford, she had knowledge of the following incidents: 1) she knew that Rose used profanity and other questionably vulgar language in his classrooms prior to May 1997 because of student's evaluations; 2) she knew of the comment Frederick made on the first day of class when she questioned the "friend" comment by Rose

in her "Student Profile;" 3) she knew of the gift that Frederick gave Rose; 4) she knew that Frederick and Rose maintained a relationship following the completion of the course based on Rose's recommendation letters for Frederick; and 5) she knew of the HyVee parking lot incident. The second is Haddox, and Frederick alleges: 1) he knew of the HyVee incident in the summer of 1997, and also, 2) that he received the letter of complaint from Frederick dated February 24, 1998.

█ A report that the school worker had slapped a student did not provide actual notice to the school that the worker was at risk of sexually abusing a student in *Gordon;* likewise, in this case, reports that Rose used inappropriate language in his class did not provide actual notice to Simpson College that Rose was at risk of sexually harassing a student.[12] Furthermore, the "friend" comment that Rose made on the first day of class and Frederick reported on her "Student Profile" did not provide actual notice to Crawford. The student profile form was intended to be used by professors to personalize instruction, and on the form it stated that the information that the student gave would be kept confidential. The Court

finds that Frederick could not have had an expectation that simply by stating that she did not understand Rose's comment that she had to be his friend to succeed in the course on this form that she was alerting an appropriate person. Furthermore, at that point in time, Rose had not yet committed the acts that Frederick's complaint alleges amounted to sexual harassment. Even though Crawford knew that Frederick made this criticism of Rose, it did not raise a "red flag" sufficient to constitute actual notice that Rose might commit sexual harassment.

Additionally, the gift which Frederick gave Rose did nothing to indicate that Rose was committing or might commit sexual harassment. The letter that accompanied the gift may have indicated to Crawford that Rose's relationship with Frederick may have been, or was at risk of becoming, more than just a teacher-student relationship, but it did not indicate that Frederick felt she was being sexually harassed by Rose. And the fact that Rose continued to write letters of recommendation for Frederick after the course was completed did not give Crawford actual notice that Rose may be sexually harassing

---

12. While Simpson College might have sought to take stronger actions to curb Rose's use of profanity and vulgar words in the classroom, the fact that Simpson College knew about Rose's language does not indicate they had actual notice that he was at risk of sexually harassing a student. A professor's choice of language in the classroom may raise difficult First Amendment issues, *see, e.g., Cohen v. San Bernardino Valley College,* 92 F.3d 968, 971 (9th Cir.1996) (noting that the protection which is to be given a college professor's classroom speech has not yet been determined by the Supreme Court of the United States), and *Bonnell v. Lorenzo,* 241 F.3d 800 (6th Cir.2001) (finding that a professor's use of profanity in the classroom was not germane to the subject matter and that it was unprotected speech, and noting that vulgar or profane speech is not entitled to absolute con-

stitutional protection), but nothing in the record indicates that reports of Rose's language in the classroom, prior to August 1997 when Frederick's class experience ended following her practicum, should have put Simpson College on actual notice that he was at risk of sexually harassing a student. The student evaluations in the record from this time period note that Rose makes inappropriate comments in class which some students did not appreciate. *See* Plaintiff's Appendix at 000236–000238. The record reflects that these evaluations were made on April 14, 1997, and there are no evaluations in the record from the summer 1997 class Frederick took from Rose. Nothing in the relevant evaluations amounts to actual notice that Rose was sexually harassing, or was at risk of sexual harassing, any of the students in his classes.

Frederick. The fact that a professor and a student continue their relationship beyond the time that the student took the professor's course would normally indicate to the chair of a college department that the student had a good experience in that professor's course, and that she voluntarily accepted the professor's support in future endeavors. While the Court does not find that this necessarily was the situation between Frederick and Rose—as Frederick alleges that while she did want him to write recommendation letters, it was Rose who insisted on meeting in person and talking on the phone regarding the letters—the Court does find that a chair of a department would perceive it to be an activity that the student was engaging in voluntarily. There is not a material issue of fact that this kind of relationship based on professorial recommendation letters would raise a red flag to a department chair that the professor was sexually harassing the student in the absence of information to the department chair about specific incidents which occurred. Nothing in either of these incidents necessarily indicated to Crawford that there was inappropriate conduct by Rose sufficient to equal actual notice.

 Now turning to the meeting in the HyVee parking lot between Frederick and Rose, the Court finds this meeting was not enough to give either Crawford or Haddox actual notice. Crawford and Haddox knew that Rose met Frederick in a parking lot, and Rose told them he went there with the intention of talking with Frederick about his suspicion that she was a victim of abuse. Rose brought the incident to their attention. It is not disputed that Haddox and Crawford did not contact Frederick to get "her side of the story" on the meeting which began in the HyVee parking lot, but nothing the Supreme Court stated in *Gebser* or in the governing law in the Eighth Circuit indicates that anyone from Simpson College had a duty to further investigate the HyVee incident.

In *Morlock v. West Central Educ. Dist.,* 46 F.Supp.2d 892, 910–11 (D.Minn.1999), plaintiff asserted that while she was still a student at the school she had told the acting principal of the school that her teacher had told her she was the "sexiest boy" he had ever seen [13] and that he had engaged in inappropriate conduct with her. *Id.* The *Morlock* court found the acting principal had actual notice. This case is not the same as *Morlock* as Frederick did not make a report related to the HyVee incident. While this Court reiterates that it agrees with the statement in *Gordon* that actual notice does not require "a clearly credible report" from the student, all of the circumstances surrounding Frederick and Rose's relationship did not give an appropriate person at Simpson College actual notice until the February 24, 1998 letter which Frederick wrote to Haddox. While it might have been advisable for either Haddox or Crawford to at least have spoken to Frederick following Rose's report of the HyVee incident, the fact that they failed to do so does not mean they had actual notice that Rose may have been sexually harassing Crawford. *See also Crandell,* 87 F.Supp.2d at 320 (stating that "the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based").

### 2. Deliberate Indifference

In examining the deliberate indifference standard in the context of Title IX, the

---

**13.** The teacher made this comment to the student after the student had gotten a short hair-cut and the issue of whether she looked "like a boy" had been raised in conversation.

court in *Gordon* stated that "[t]he Court must examine the 'adequacy of the response' . . . in light of the 'seriousness and credibility of the compliant that puts school officials on notice.' " *Gordon*, 115 F.Supp.2d at 1082–83 (quoting *Kinman v. Omaha Public Sch. Dist.*, 171 F.3d 607, 610 (8th Cir.1999) and *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir.2000)). Simpson College's response, following receipt of the February 24, 1998 letter from Frederick to Haddox was to have its human resources director, Mimi Bartley, investigate the complaint. Bartley conducted an investigation in March 1998, and issued a report at the beginning of April 1998. It is clear that it was a serious complaint by Frederick, and the Court is not aware of any reason for Simpson College to have questioned Frederick's credibility at the time it received her complaint.

The court in *Gordon* found that there was not a material issue of fact as to whether the school had been deliberately indifferent. *Id.* at 1083. The incident in that case which gave the school actual notice was when the substitute associate teacher, Skinner, had reportedly hugged and kissed a student inappropriately. In response, the school investigated and concluded the complaint was unfounded. *Id.* Regardless of this finding, the principal of the school still advised Skinner not to have facial contact with a student and told him how to appropriately hug a child. *Id.* The court in *Gordon* found that a reasonable fact finder could not conclude that the school had been deliberately indifferent to the allegations against Skinner. It noted that the school had promptly and adequately investigated the allegation, taken remedial action, and not turned a blind eye. The response could not "be fairly described as 'an official decision not to remedy the violation.' " *Id.* (quoting *Kinman*, 171 F.3d at 610); *see also Doe v. Special Sch. Dist. of St. Louis*, 901 F.2d

642 (8th Cir.1990) (cited in *Gordon* and detailing that deliberate indifference is a much higher standard than negligence).

In *Waters v. Metropolitan State Univ.*, 91 F.Supp.2d 1287 (D.Minn.2000), a student brought a Title IX action for sexual harassment after the student had engaged in consensual sexual relations with a professor. The court found that the university had not been deliberately indifferent, as it had conducted an investigation after plaintiff had formally lodged her complaint. *Id.* at 1292. The court went on to state that "while the Court may wish that the University's investigation procedures were a little more thorough, the Court finds that the evidence simply does not support a finding of deliberate indifference on the part of the University." *Id.* at 1293.

■ In this case, the Court finds that Simpson College did not act with deliberate indifference toward Frederick and her complaint after they had actual notice. It conducted a prompt investigation, and a three page report was compiled. Like the district court in *Waters*, this Court believes that Simpson College's investigation could have been more thorough. Furthermore, this Court wishes that someone who was more adequately trained to handle such a complaint was in charge of the investigation. And, this Court recognizes the expert opinion of Billy Wright Dziech that Simpson College's investigation and procedures for sexual harassment were subpar. The Court finds that Simpson College's actions, while bordering on negligence, did not amount to deliberate indifference.

Therefore, in accord with its finding that there is not a material issue of fact whether Simpson College acted with deliberate indifference once it had actual notice, the Court will grant the College's motion for summary judgment on Frederick's Title IX claim for monetary damages.

### 3. Retaliation

■ Plaintiff alleges that she was treated differently by students and faculty at Simpson following her complaint of sexual harassment against Rose, and that Simpson denied her application for independent study in the fall of 1998. "There has been very little case law development of the proper standard to apply in a Title IX retaliation claim." *Litman*, 131 F.Supp.2d 795, 800–01 (questioning the standards applicable to a retaliation claim in the Title IX context). Retaliation in the Title VII context requires that plaintiff engaged in a protected activity, there was a subsequent adverse action by the defendant, and there was a causal link between the two. *See, e.g., Cross v. Cleaver II*, 142 F.3d 1059, 1071 (8th Cir.1998). While it has already been outlined that Title IX is distinguishable from Title VII, the Court is satisfied that the basic elements of retaliation are comparable under both sets of laws.

■ Simpson provided evidence in the record that someone who was not a full time student would generally not be admitted into a course of independent study. Furthermore, even assuming Frederick was treated differently by members of the faculty or students at Simpson College, it is difficult to understand how that could rise to the level of an adverse action by Simpson College. In this case, the Court finds there is not a material issue of fact whether Simpson College retaliated against Frederick following her letter accusing Rose of sexual harassment.

### 4. Whether the Court Should Maintain Plaintiff's Title IX Claim To Address Potential Relief Other than Monetary Damages

■ A plaintiff may seek relief under Title IX other than monetary damages.

The standards which apply when the remedy sought is not monetary damages are not so clear.

> Title IX private causes of action for injunctive and declaratory relief are authorized by Cannon v. University of Chicago. Since money damages are not sought, this type of claim is apparently not directly governed by the Gebser and Davis cases—whose factual context is limited to monetary liability and whose legal rationale seems largely dependent on the negative impact of monetary damage awards upon educational institutions. It is therefore not clear what liability standard would apply to a Title IX harassment claim against an institution seeking only injunctive or declaratory relief.

William A. Kaplin, *Typology and Critique of Title IX Sexual Harassment Law After Gebser and Davis*, 26 J.C. & U.L. 615, 637 (Spring 2000).

Neither party in their briefs has sufficiently addressed whether Frederick has to show actual notice and deliberate indifference to maintain her Title IX claim for relief other than monetary damages, or if she need only make some lesser showing than that dictated by *Gebser*. While plaintiff cited to various federal regulations sections as support for the proposition that a lesser standard applies when relief other than monetary damages is sought by a Title IX plaintiff, this issue was not addressed by defendant, Simpson College. Therefore, the Court orders that the parties address this issue in supplemental briefs by May 1, 2001.

### C. Intentional Infliction of Emotional Distress Claim Against Rose

■ To make a claim of intentional infliction of emotional distress under Iowa

law, a plaintiff must show that: 1) the defendant engaged in outrageous conduct; 2) the defendant had the intent to cause emotional distress or acted with a reckless disregard of the probability of causing emotional distress; 3) the plaintiff suffered severe or extreme emotional distress; and 4) actual and proximate causation. *See Noble v. Monsanto Co.*, 973 F.Supp. 849, 859–60 (S.D.Iowa 1997) (citing *Vinson v. Linn–Mar Comm. Sch.*, 360 N.W.2d 108, 118 (Iowa 1984)). The first element, whether the defendant's conduct is outrageous, is a matter of law for the court to decide. *Id.* at 860. The *Noble* case involved a claim of intentional infliction of emotional distress by plaintiff, an employee, that she had been subjected to abusive name calling and incidents of obscene drawings which were made by her fellow employees. *Id.* The *Noble* court concluded that this kind of harassment did not amount to outrageous conduct, and granted defendant's motion for summary judgment with respect to the claim. *Id.* (referencing *Vinson*, 360 N.W.2d at 119, as that case held that defendant's "deliberate campaign to badger and harass plaintiff" did not amount to the level of conduct required for the outrageous element).

In a case which also involved Title IX claims by the plaintiff along with a claim of intentional infliction of emotional distress, the court found the outrageousness element had not been met. *See Burrow v. Postville Comm. Sch. Dist.*, 929 F.Supp. 1193 (N.D.Iowa 1996). In that case, plaintiff alleged she had been harassed by her peers in school. The Court determined that the school district's failure to protect her was not so extreme as to amount to outrageous conduct. *Id.* at 1210. *See also Edmunds v. Mercy Hospital*, 503 N.W.2d

877, (Iowa Ct.App.1993) (finding that plaintiff, who was a nurse that alleged she had been sexually harassed in her employment, had not shown that defendant's conduct had been outrageous).

 Outrageousness requires that the behavior be "atrocious, utterly intolerable in a civilized community." *Noble*, 973 F.Supp. at 860. Rose's behavior was not appropriate. The Court even finds that it would have often been offensive. However, nothing that happened in the course of the college classroom amounts to outrageous conduct as defined in the Iowa case law surrounding the tort of intentional infliction of emotional distress. After the class was over, it is clear that Frederick and Rose maintained a bizarre relationship between a professor and a student—but Frederick was an adult student who chose of her own volition to maintain her relationship with Rose after the course was over so that he could write letters of recommendation on her behalf. His behavior during their meetings and on the phone [14] relating to the recommendation letters—while perhaps inappropriate, disgusting, or even offensive—can not be labeled outrageous under Iowa's law of intentional infliction of emotional distress. The Court also notes that while plaintiff's son's death during this time period was a tragedy, to blame that tragedy on Rose's behavior goes beyond that for which a defendant, in a sexual harassment case such as this, can be held accountable.

III. CONCLUSION

For the aforementioned reasons, the Court grants Simpson College's motion for summary judgment on Count I insofar as Frederick sought monetary damages under Title IX. The Court also grants Rose's

---

14. While the Court has not noted it previously, the record reflects that Frederick called Rose more than two hundred times at either his home or office from June 1997 through February 1998.

motion for summary judgment on Frederick's claim in Count V for intentional infliction of emotional distress.

Simpson College and Frederick should each file a brief by May 1, 2001 addressing what standards should govern Frederick's Title IX claim for relief other than monetary damages. The parties may also in their respective briefs address the issue of pendent jurisdiction on Counts II, III, IV and VI should the Court determine that federal question jurisdiction no longer exists in this case. The parties are reminded that they should make every attempt to adhere to the length limitations placed on briefs in Local Rule 7.1.

IT IS SO ORDERED.